(No. 58628.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. GREGORY TISLER, Appellee.

*Opinion filed September 20, 1984.*

WARD, J., concurring.
CLARK, J., specially concurring.
GOLDENHERSH and SIMON, JJ., dissenting.

Neil F. Hartigan, Attorney General, of Springfield, and Gary L. Peterlin, State's Attorney, of Ottawa (John X. Breslin and Vicki R. Wright, of the State's Attorney's Appellate Service Commission, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Sue Augustus, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellee.

CHIEF JUSTICE RYAN delivered the opinion of the court:

At a bench trial in the circuit court of La Salle County, the parties stipulated that defendant, Gregory Tisler, had possessed less than 30 grams of LSD. This crime constituted a Class 4 felony under the Illinois Controlled Substances Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1402(b)). Defendant was convicted and sentenced to 24 months' probation and one weekend in the La Salle County Correctional Center. In addition, defendant was

fined $500 and ordered to pay costs of $120.

Before trial, defendant moved to suppress evidence that he claimed was obtained either through an illegal seizure or through a search incident to an illegal arrest. The trial court, after hearing testimony, denied the motions and allowed the evidence.

Defendant appealed, and the appellate court reversed the judgment without remand. Finding that defendant's arrest was without probable cause, the appellate court held that all evidence obtained as a result of the arrest must be suppressed. (114 Ill. App. 3d 214, 216.) We allowed the State's petition for leave to appeal, which was filed pursuant to Supreme Court Rules 315(a) and 612(b). 87 Ill. 2d Rules 315(a), 612(b).

Before this court, the State raises the issue whether the trial court properly denied defendant's motions to suppress evidence. We will address this question after a statement of the pertinent facts. Our disposition of this first issue renders it unnecessary to consider a second issue that the State raises in its brief.

James Hollenbeck, a police officer for the city of Marseilles, testified at the hearing on the motions to suppress. While off duty on Saturday, January 9, 1982, Hollenbeck received a telephone call at 2:30 p.m. from an informant. The caller identified himself, and the officer recognized him as an informant that he had dealt with before. The caller then related the following information: that at the time they were speaking, two Marseilles residents were on their way to Streator to pick up "some hits" of LSD. After they obtained the LSD, the two individuals—defendant Tisler and a friend, Jerry Cox—would return to Marseilles at 3:40 p.m., a little over an hour hence. They would be riding in Tisler's car, a green, two-door Chevrolet Camaro with the letters "JAT" on its license plates. After they entered Marseilles via the river bridge, Tisler and Cox would proceed

north on Main Street to the Number Nine Game Room. There, they would deliver the LSD.

The informant also stated that the LSD would be in a very small container which easily could be disposed of if Hollenbeck were to detain Tisler and Cox with an ordinary traffic stop. Therefore, the informant advised, Hollenbeck should approach the subjects only after they had parked at the Game Room and were out of the car.

Hollenbeck had worked with this informant twice before, and the informant's tips had always been accurate. In one case, a single tip resulted in arrest and conviction. The other case involved the informant's supplying information at several times during a four- to six-week period. Again, the information led to an arrest and conviction. Tips supplied by this informant, however, had never been used by Hollenbeck or his police department to obtain a search or arrest warrant.

Certain aspects of the tip were familiar to Hollenbeck. He knew Tisler and Cox, and, to the best of his knowledge, Tisler was a Marseilles resident. He knew Tisler's car, recalling it as a lime green, two-door Chevrolet Camaro. He also knew that its full license plate number was JAT 76. Hollenbeck recognized the Number Nine Game Room as a Marseilles business that served as a hangout for local teenagers. Finally, he knew that several routes led from Streator to Marseilles, but that the road leading over the river bridge was the shortest, most direct route.

After the telephone call, Hollenbeck sought help in obtaining a warrant. Since it was Saturday, he knew that judges' offices were closed. In such a case, the La Salle County procedure was to contact an assistant State's Attorney and advise him of the facts on which the officer based his suspicions. If the assistant State's Attorney thought the facts would support a probable-cause finding, he would meet with the officer, draft a warrant, and

contact a judge at home to request his signature. Although this procedure usually took from two to three hours, Hollenbeck attempted to contact the first assistant State's Attorney at home and at his office. Unsuccessful, he left a message for the attorney to call right away. After failing to reach another assistant State's Attorney at home, Hollenbeck proceeded without a warrant.

Hollenbeck and Officer Stevenson drove to South Main Street in Marseilles and parked where they could watch the river bridge. They wore street clothes and traveled in Hollenbeck's private car, an Oldsmobile with no police insignia or equipment. The winter weather that day was unusually severe: Hollenbeck testified that the temperature was 25 degrees below zero with a wind-chill factor of 60 degrees below zero. Snow fell, and area roads were becoming impassable.

At 3:45 p.m., the officers saw a green Chevrolet Camaro approach from the south, from the direction of the river bridge. The officers had not seen the car cross the bridge. On the Camaro's license plates was the number "JAT 76." Defendant was driving, Jerry Cox sat in front on the passenger side, and a third male, unknown to the officers, rode in the back seat.

Hollenbeck pulled in directly behind defendant's car and followed for about three blocks as defendant proceeded north on Main Street. When defendant parked across the street from the Number Nine Game Room, the officers left Hollenbeck's car and approached the Camaro.

Defendant stepped out of his car and Hollenbeck saw that his left hand was closed. What looked like a plastic bag extended from defendant's fist, but the officer could not see what its contents might be. While defendant stood between his car and its still open door, Hollenbeck asked him what he was holding. Defendant replied,

"Nothing," so Hollenbeck inquired again, explaining to defendant that he could see something in his hand. At this point, defendant started to move his left hand around behind his back.

Hollenbeck then took defendant's left hand and removed a small plastic bag. It contained several pills, which the officer recognized as "dots." As Hollenbeck retrieved the plastic bag, he placed defendant under arrest. The officers then searched the area immediately surrounding defendant. After being patted down and handcuffed, defendant was taken to the police station in a squad car that waited nearby. Sometime after the arrest, a forensic scientist's report disclosed that the pills taken from defendant contained LSD.

Austin Tisler, defendant's father, also testified at the hearing on the motions to suppress. Mr. Tisler was familiar with the Number Nine Game Room. He described it as a pool room with game devices—a "soda fountain for teenagers." He was aware that defendant, his 17-year-old son Greg, frequented the Game Room. When asked how often his son visited the establishment, Mr. Tisler estimated that defendant stopped at the Game Room once a day.

Before proceeding, we note that the trial court viewed the police conduct in this case as a warrantless arrest accompanied by a search incident to arrest. We will treat the facts in the same manner. It follows, then, that the central issue is the legality of the warrantless arrest. If probable-cause requirements were met before the arrest, then evidence seized during the search incident to arrest was properly admitted at trial.

We now address whether the trial court correctly found that probable cause existed for defendant's arrest. While stressing the informant's past reliability, the State maintains that the tip in this case is sufficiently detailed to be self-verifying in nature. According to the State, the

detailed tip, when considered in light of the officers' corroboration of the details, is sufficient to justify the trial court's finding of probable cause. Therefore, the State reasons, the LSD seized in the search incident to arrest was legally obtained and properly admitted into evidence. The State argues that the appellate court, which reversed and excluded the evidence, reached an incorrect result because it failed to consider either the self-verifying details or the subsequent corroboration.

Defendant, on the other hand, denies that the officers had probable cause for his arrest. Therefore, he argues, the police conduct violated his rights under the United States and Illinois constitutions. Defendant claims that, under these circumstances, the trial court should have excluded the LSD and other items seized at the time of the arrest. His theory is based on the informant's failure to explain how he learned the information that he related by telephone to Hollenbeck. Defendant explains that, for all Hollenbeck knew at the time of arrest, the tip was based on a casual rumor or even was wholly fabricated by someone who knew of defendant's routine visits to the Game Room. Given the absence of a statement from the informant assuring that he obtained his story reliably, defendant contends that the information known to the officers did not meet constitutional standards for probable cause. Defendant rejects the notion that the tip was sufficiently detailed or corroborated to cure this deficiency.

The fourth amendment to the United States Constitution guarantees the right to be free from unreasonable search and seizure. The amendment specifies that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., amend. IV.) With respect to unreasonable search and seizure, as well as to the issuance of

warrants, the language of the 1970 Illinois Constitution is nearly identical to that of the Federal guarantee. Ill. Const. 1970, art. I, sec. 6.

In reference to Federal and State warrant requirements, this court has explained that a detached judicial officer must resolve the question of whether probable cause exists to justify issuing a warrant. The decision is to be based on information contained in sworn statements or affidavits that are presented to the magistrate. (*People v. Greer* (1981), 87 Ill. 2d 89, 92.) Whether probable cause exists in a particular case turns on the "totality of the circumstances and facts known to the officers and court when the warrant is applied for." (*People v. Free* (1983), 94 Ill. 2d 378, 400.) The probability of criminal activity, rather than proof beyond a reasonable doubt, is the standard for determining whether probable cause is present. (*Spinelli v. United States* (1969), 393 U.S. 410, 419, 21 L. Ed. 2d 637, 645, 89 S. Ct. 584, 590; *People v. Exline* (1983), 98 Ill. 2d 150, 154.) Whether the necessary probability exists is governed not by technical legal rules, but rather by common-sense considerations that are factual and practical. *Brinegar v. United States* (1949), 338 U.S. 160, 175, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310; *People v. Mitchell* (1970), 45 Ill. 2d 148, 153-54.

When a police officer has proceeded without a warrant to search, seize evidence, or arrest a person, the trial court making a probable-cause determination is to apply standards at least as stringent as those that guide a magistrate in deciding whether to issue a warrant. (*People v. Johnson* (1983), 94 Ill. 2d 148, 153.) The Code of Criminal Procedure of 1963 allows a warrantless arrest only when a peace officer "has reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1983, ch. 38, par. 107—2(1)(c).) As used in the statute, "reasonable grounds" is

considered to have the same substantive meaning as "probable cause." *People v. Wright* (1974), 56 Ill. 2d 523, 528-29, quoting *Brinegar v. United States* (1949), 338 U.S. 160, 175-76, 93 L. Ed. 1879, 1890, 69 S. Ct. 1302, 1310-11.

To determine whether a warrantless arrest meets the reasonable-grounds/probable-cause requirement, the trial court must decide whether "a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense." (*People v. Wright* (1968), 41 Ill. 2d 170, 174.) In determining whether the officer had probable cause, the officer's factual knowledge, based on his prior law-enforcement experience, is relevant. (*People v. Smith* (1983), 95 Ill. 2d 412, 419-20.) If the trial court finds that a warrantless arrest was based on probable cause, the arrest is deemed lawful, and evidence obtained during a warrantless search incident to that arrest is admissible to prove defendant's guilt. *People v. Wright* (1968), 41 Ill. 2d 170, 173; *People v. McCray* (1965), 33 Ill. 2d 66, 69, *aff'd* (1967), 386 U.S. 300, 18 L. Ed. 2d 62, 87 S. Ct. 1056; see also Ill. Rev. Stat. 1983, ch. 38, par. 108—1; *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (limiting the scope of a search incident to arrest to the area within defendant's reach).

A police officer need not have observed personally the facts that he presents to a magistrate making a probable-cause determination. The officer's statements may be based on hearsay, and frequently such hearsay statements originate with an informant's tip. If facts supplied in a particular tip are essential to a finding of probable cause, the tip must meet standards of reliability before the magistrate may consider it in his determination. In *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, the Supreme Court held that a

magistrate should look to the totality of the circumstances when assessing an affidavit that relies on an informant's story:

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* (1983), 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332.)

The Supreme Court in *Gates* thus reaffirmed that the reliability of hearsay statements, as measured by the informant's veracity and basis of knowledge, is highly relevant to the existence of probable cause. Scrutiny of these factors, the court observed, is to guide a magistrate who must make a probable-cause determination. 462 U.S. 213, 230-31 n.6, 76 L. Ed. 2d 527, 543 n.6, 103 S. Ct. 2317, 2328 n.6.

The *Gates* court also reaffirmed other methods established in its prior opinions for evaluating a tip. The court again emphasized the value of independent police investigation that corroborates the details of an informant's story. (462 U.S. 213, 241-45, 76 L. Ed. 2d 527, 550-52, 103 S. Ct. 2317, 2334-35.) When a tip is proved accurate on some counts, the court explained, the informant is more likely correct about other details, including the alleged illegal activity. (462 U.S. 213, 244, 76 L. Ed. 2d 527, 552, 103 S. Ct. 2317, 2335 quoting from *Spinelli v. United States* (1969), 393 U.S. 410, 427, 21 L. Ed. 2d 637, 650, 89 S. Ct. 584, 594 (White, J., concurring).) Corroboration operates in this way to reduce the risk that an informant's tip stems from an inaccurate rumor or a fabricated story. 462 U.S. 213, 244-45, 76 L. Ed. 2d 527, 552, 103 S. Ct. 2317, 2335.

After recognizing the continued importance of corrob-

oration, the Supreme Court in *Gates* restated the principle that a tip containing a wide range of detail—which would have been difficult to obtain or predict—may support an inference of reliability. A properly detailed tip suggests that the informant obtained his story in a reliable fashion, from either the alleged wrongdoer or from someone closely related to the criminal conduct. 462 U.S. 213, 245, 76 L. Ed. 2d 527, 552-53, 103 S. Ct. 2317, 2335-36; see *Spinelli v. United States* (1969), 393 U.S. 410, 416, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 589.

By adopting the totality-of-circumstances approach, the United States Supreme Court abandoned its former test for assessing the reliability of an informant's tip. Before *Gates,* the standard for evaluating a tip required that a police officer seeking a warrant disclose certain underlying circumstances: those from which the informant drew his conclusions and those from which the police officer concluded that his informant was credible. *Aguilar v. Texas* (1964), 378 U.S. 108, 114-15, 12 L. Ed. 2d 723, 729, 84 S. Ct. 1509, 1514.

These requirements became well known as the "*Aguilar* two-pronged test," and the test also was applied to probable-cause questions that arose from warrantless arrests and searches. The first or "basis of knowledge" prong required the magistrate to assess an informant's statements regarding how he learned the information. The second or "veracity" prong required an evaluation of either the informant's past record of truthfulness or facts indicating that the present information was reliable. (1 W. LaFave, Search and Seizure sec. 3.3, at 501-02 (1978).) The *Aguilar* test was designed to insure that the inferences which led to a finding of probable cause would be drawn by the magistrate, and not by the police officer or his informant. *Aguilar v. Texas* (1964), 378 U.S. 108, 115, 12 L. Ed. 2d 723, 729, 84 S. Ct. 1509, 1514.

Under interpretations of *Aguilar*, each prong of the test involved an independent and distinct evaluation. When an informant's story contained facts sufficient to meet only one of the two prongs, the tip could not be used, even where the facts which supported the one prong indicated a fair probability that the tip was reliable. However, if the magistrate found that the tip satisfied both of the *Aguilar* prongs, he could consider the informant's tip when he made the probable-cause determination. See generally 1 W. LaFave, Search and Seizure sec. 3.3(b) (1978).

The Supreme Court's decision to replace the two-pronged test was prompted by the inflexible manner in which lower courts had applied the test. The court explained in *Gates* that it never had intended the rigid compartmentalization that had developed around the *Aguilar-Spinelli* standards. (*Illinois v. Gates* (1983), 462 U.S. 213, 229-30 & n.6, 76 L. Ed. 2d 527, 542-43 & n.6, 103 S. Ct. 2317, 2327-28 & n.6.) Informants' tips, the court stated, are simply too diverse to effectively be measured with a set of rigid legal rules. "[T]he 'two-pronged test' has encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate." 462 U.S. 213, 234-35, 76 L. Ed. 2d 527, 545-46, 103 S. Ct. 2317, 2330.

The *Gates* court reaffirmed its concern that the informant be trustworthy, and it stressed that the probable-cause decision still rests with a neutral magistrate. (462 U.S. 213, 239 & n.11, 76 L. Ed. 2d 527, 548-49 & n.11, 103 S. Ct. 2317, 2332-33 & n.11.) However, the court held that, in this context, probable-cause analysis should no longer be directed into two independent channels. Under the totality-of-circumstances approach, a deficiency with respect to one of the *Aguilar* requirements

can be overcome "by a strong showing as to the other, or by some other indicia of reliability." 462 U.S. 213, 233, 76 L. Ed. 2d 527, 545, 103 S. Ct. 2317, 2329.

Before applying the totality-of-circumstances standard to the case at bar, we consider defendant's arguments that *Aguilar-Spinelli* standards should govern this case. Defendant argues that as a matter of State constitutional law, this court should reject the *Gates* approach and retain the *Aguilar* two-pronged test. Explaining that *Gates* sets a bare minimum standard, defendant points out that Illinois may afford its citizens greater protection than that provided by the United States Constitution. Defendant states that the drafters of article I, section 6, of the 1970 Illinois Constitution intended to expand the right of Illinois citizens to be free from unreasonable police conduct. Fearing that the more flexible *Gates* approach will undermine both the magistrate's role and the probable-cause standard, defendant urges this court to reject the totality-of-circumstances approach.

We reject defendant's contention that State protection in this particular context was intended to be more extensive than that provided at the Federal level. Defendant asserts that article I, section 6, of the 1970 Illinois Constitution guarantees more individual rights than either the former State Constitution or the fourth amendment to the Federal Constitution. In the committee report to the constitutional convention that accompanied the present Illinois section, the drafters stated their intent that changes to the section would accomplish two specific goals: First, the new language would provide citizens with express protection against eavesdropping devices. Second, the section now would protect against invasions of privacy. Proposals to change other aspects of article I, section 6, were rejected in committee. As a result, the language pertinent to the case at bar—the

warrant clause with its probable-cause requirement, and the guarantee against unreasonable search and seizure—remains nearly the same as that of the fourth amendment. (6 Record of Proceedings, Sixth Illinois Constitutional Convention 29, 33 (hereafter cited as Proceedings).) Thus, the intent of the constitutional convention was to extend the protection afforded by the fourth amendment of the Federal Constitution and of our 1870 State Constitution to cover eavesdropping and to protect against invasions of privacy. The explanation to the voters prior to the adoption of the 1970 Constitution simply states: "This is an amended version of Article II, Section 6 of the 1870 Constitution expanded to include guarantees of freedom from unreasonable eavesdropping and invasions of privacy. The restriction on warrants is unchanged." (See 7 Proceedings 2683.) The convention manifested no intent to expand the nature of the protection afforded by the fourth amendment of the Federal Constitution. (See *People v. Hoskins* (1984), 101 Ill. 2d 209.) In G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 28 (1969), a book prepared for the Illinois Constitution Study Commission in preparation for the 1970 constitutional convention, in discussing the 1870 Constitution, it is stated that the fourth amendment to the United States Constitution is the direct and lineal ancestor of the protection afforded by the Illinois Constitution. Both constitutional provisions were designed to protect against the same abuses. (See *People v. Grod* (1944), 385 Ill. 584, 586.) The difference in the language of the 1970 Constitution from that found in the 1870 Constitution and the fourth amendment of the Federal Constitution, to which defendant refers, does no more than specifically provide for fourth amendment protection with regard to eavesdropping and invasion of privacy.

With respect to the basic requirements that stem

from the language of our constitution, this court has considered that the State and Federal constitutions impose the same restrictions. (See, *e.g., People v. Greer* (1981), 87 Ill. 2d 89, 92.) In both *People v. Greer* (1981), 87 Ill. 2d 89, 92, and *People v. Gates* (1981), 85 Ill. 2d 376, 381-82, this court referred to both the protection of the fourth amendment to the Federal Constitution and of article I, section 6, of the Illinois Constitution of 1970. In each case we held the search invalid because the informant's tip did not comply with the *Aguilar* test. In doing so, we were not establishing the *Aguilar* test as defining the extent of the protection afforded by the Illinois Constitution. Those decisions, in effect, held that the protection against unreasonable searches under the Illinois Constitution is measured by the same standards as are used in defining the protection against unreasonable searches contained in the fourth amendment to the United States Constitution.

Both our constitution and the Federal Constitution protect individuals against unreasonable searches. Both constitutions provide that no warrant shall issue without probable cause. Subject to the limitations noted later, this court may construe these terms as contained in our constitution differently from the construction the Supreme Court has placed on the same terms in the Federal Constitution. Indeed, Justice White, in his *Gates* concurrence, observed that "[t]he Illinois Supreme Court may decide to retain the [*Aguilar*] test for purposes of the State Constitution." (*Illinois v. Gates* (1983), 462 U.S. 213, 252, 76 L. Ed. 527, 557, 103 S. Ct. 2317, 2339 (White, J., concurring).) However, this court has, in the past, in construing provisions of our constitution, elected to follow the decisions of the Supreme Court rendered in construing similar provisions of the Federal Constitution. In *People v. Jackson* (1961), 22 Ill. 2d 382, the validity of a search warrant issued on a complaint based partly on

hearsay was involved. The court relied on a decision of the Supreme Court which held that hearsay may be used to establish probable cause for a warrant and stated: "We have indicated before that we will follow the decisions of the United States Supreme Court on identical State and Federal constitutional problems." (*People v. Jackson* (1961), 22 Ill. 2d 382, 287.) The *Jackson* court cited *People v. Tillman* (1953), 1 Ill. 2d 525, which upheld a warrantless search incident to an arrest. In doing so, the *Tillman* court cited both prior decisions of this court and a decision of the United States Supreme Court, and stated:

> "The provision of the constitution of the United States, relied upon by plaintiff in error, while in somewhat different language, is in effect the same, and the provisions of the two constitutions are construed alike and should be liberally construed in favor of the accused." (*People v. Tillman* (1953), 1 Ill. 2d 525, 529.)

In *Wilson v. Schnettler* (1961), 365 U.S. 381, 384 n.2, 5 L. Ed. 2d 620, 623 n.2, 81 S. Ct. 632, 634 n.2, the Supreme Court noted that the language of article II, section 6, of the Illinois Constitution of 1870 is substantially the same language as the fourth amendment and that this State's "interpretation of its constitutional provision and its exclusionary rule, similar to the one followed in the federal courts, makes the Illinois law accord with the principles established by this Court for the federal system."

Also, in *People ex rel. Hanrahan v. Power* (1973), 54 Ill. 2d 154, this court considered the constitutional provision against self-incrimination in the fifth amendment of the Federal Constitution and in section 10 of article I of the Illinois Constitution of 1970, and section 10 of article II of the Illinois Constitution of 1870. Noting the minor differences in language, this court stated: "The two provisions differ in semantics rather than in substance and

have received the same general construction." *People ex rel. Hanrahan v. Power* (1973), 54 Ill. 2d 154, 160.

After having accepted the pronouncements of the Supreme Court in deciding fourth amendment cases as the appropriate construction of the search and seizure provisions of the Illinois Constitution for so many years, we should not suddenly change course and go our separate way simply to accommodate the desire of the defendant to circumvent what he perceives as a narrowing of his fourth amendment rights under the Supreme Court's decision in *Illinois v. Gates.* Any variance between the Supreme Court's construction of the provisions of the fourth amendment in the Federal Constitution and similar provisions in the Illinois Constitution must be based on more substantial grounds. We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned.

Decisions involving the exclusionary rule and the Illinois Constitution's article I, section 6, require that we carefully balance the legitimate aims of law enforcement against the right of our citizens to be free from unreasonable governmental intrusion. (*People v. Smith* (1983), 95 Ill. 2d 412, 422.) With this in mind, we note our agreement with the *Gates* conclusion regarding the *Aguilar* standard. The two-pronged test correctly stressed reliability, but its rigid rules were inconsistent with a nontechnical, common-sense approach to the probable-cause requirement. Like the Supreme Court, we think that the totality-of-circumstances approach will achieve a fairer balance between the relevant public and private interests. (See *Illinois v. Gates* (1983), 462 U.S. 213, 239, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332.)

Accordingly, we adopt the *Gates* standard for resolving probable-cause questions under the Illinois Constitution that involve an informant's tip.

Defendant argues alternatively that, if adopted by this court, the *Gates* approach should only be applied prospectively. Because the arrest in this case occurred before the Supreme Court decided *Gates,* defendant maintains that the police conduct here should be measured against the *Aguilar* standard.

In *United States v. Johnson* (1982), 457 U.S. 537, 562, 73 L. Ed. 2d 202, 222, 102 S. Ct. 2579, 2594, the Supreme Court held that a decision adopting a new fourth amendment rule should be applied retroactively to all cases pending on appeal at the time of the decision. The Supreme Court excepted from this holding any decision that represents a " 'clear break with the past,' " and the court indicated that nonretroactivity was proper for such a case. (457 U.S. 537, 549, 73 L. Ed. 2d 202, 213-14, 102 S. Ct. 2579, 2587; see 3 W. LaFave, Search and Seizure sec. 11.5, at 273, 275-76 (Supp. 1984).) Accordingly, defendant proclaims *Gates* to be a clear break from the *Aguilar* standard, so that prospective application of *Gates* is required. The State, on the other hand, cites *United States v. Mendoza* (5th Cir. Mar. 19, 1984), 35 Crim. L. Rep. (BNA) 2035, as support for its assertion that *Gates* is not within the clear-break exception and is therefore retroactively applicable under the general rule of *Johnson.*

We find it unnecessary to resolve this disagreement, because, in our view, *United States v. Johnson* does not control the case at bar. The Supreme Court in *Johnson* was concerned with the retroactive application of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, a decision that expanded fourth amendment protection. Because the *Gates* approach is considered to be less beneficial to defendants than the *Aguilar* test

that it replaced, *Johnson* does not govern the retroactivity issue that *Gates* presents. See *People v. Smith* (1983), 95 Ill. 2d 412, 421; 3 W. LaFave, Search and Seizure sec. 11.5, at 276 (Supp. 1984).

Looking to the pre-*Johnson* balancing test, which would appear to govern cases that are unaffected by *Johnson*, we note that the foremost factor to be considered is the purpose that the new standard is to serve. If this purpose does not indicate whether retroactive application is appropriate, then the extent of reliance on the former standard and the effect of retroactive application on the administration of justice are also considered. *Stovall v. Denno* (1967), 388 U.S. 293, 297, 18 L. Ed. 2d 1199, 1203, 87 S. Ct. 1967, 1970; *People v. Laws* (1981), 84 Ill. 2d 493, 499-500.

Here, the purpose factor favors retroactivity. The purpose of the *Gates* holding is to prevent overly technical legal rules from excluding evidence in cases where a common-sense view of all the circumstances indicates that the probable-cause requirement is satisfied. A retroactive application of *Gates* clearly will advance this purpose in pending cases, but will in no way interfere with the deterrence objectives of the exclusionary rule. Since *Gates* makes admissible evidence that will be seized in future cases by police conduct similar to that in this case, suppressing this evidence will have no deterrent effect upon such conduct. Suppressing evidence now on the basis of *Aguilar* "would make sense only if there was some reason to believe that otherwise police might violate other Supreme Court decisions in the expectation that the Court would abandon them." 3 W. LaFave, Search and Seizure sec. 11.5, at 699 (1978).

In *People v. Smith* (1983), 95 Ill. 2d 412, this court considered the retrospective application of *United States v. Ross* (1982), 456 U.S. 798, 72 L. Ed. 2d 572, 102 S. Ct. 2157, which holding narrowed a protection afforded

by the fourth amendment. In that case, also, we concluded that retrospective application would comport with the pre-*Johnson* balancing test for determining whether a new constitutional decision should be applied retrospectively. In considering the question of legitimate reliance on the previous law as proclaimed by the Supreme Court, we noted in *Smith* that no legitimate reliance interests would be affected by the prospective application of the *Ross* standard and quoted the following from that case:

> " 'Any interest in maintaining the status quo that might be asserted by persons who may have structured their business of distributing narcotics or other illicit substances on the basis of judicial precedents clearly would not be legitimate.' " *People v. Smith* (1983), 95 Ill. 2d 412, 422, quoting *United States v. Ross* (1982), 456 U.S. 798, 824 n.33, 72 L. Ed. 2d 572, 593 n.33, 102 S. Ct. 2157, 2172 n.33.

Recently the Supreme Court, although it did not discuss retroactivity, nonetheless applied *Gates* retroactively in *Massachusetts v. Upton* (1984), 466 U.S. ___, 80 L. Ed. 2d 721, 104 S. Ct. 2085. We consider the rationale of *Smith* applicable in our case. For these reasons, we hold that *Gates* has retrospective application.

We now consider whether, in view of all the circumstances presented to the trial court, the arrest was unlawful under the holding in *Gates*. Initially, we note that a reviewing court will not disturb a trial court's finding on a motion to suppress, unless that finding is manifestly erroneous. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165; *People v. Haskell* (1968), 41 Ill. 2d 25, 30.) In *Gates*, the Supreme Court stated that our task on review is simply to ensure that the trial court had a substantial basis for concluding that probable cause existed. *Illinois v. Gates* (1983), 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332.

There is no doubt that Hollenbeck could consider his informant to be a reliable source. This court has regarded as believable an informant whose past tips have led to "pending" arrests. (*People v. Thomas* (1975), 62 Ill. 2d 375, 382.) "[C]ourts have with virtual unanimity held that a declaration that the informant's past information has led to convictions is a sufficient showing of the informer's credibility." (1 W. LaFave, Search and Seizure sec. 3.3, at 509 (1978).) As noted above, the informant's information had led to arrests and convictions on two occasions. In one of the cases, the informant consistently supplied accurate information over an extended period. While the facts do not indicate that the prior tips pertained to drug possession, there is no requirement that the informant be an expert in a given area. The relevant consideration is instead the informant's ability to truthfully report timely information. 1 W. LaFave, Search and Seizure sec. 3.3, at 520 (1978).

We have also noted that, before defendant's arrest, Hollenbeck and Stevenson had corroborated many details of the informant's story. The officer knew defendant as an area resident and could identify defendant and his companion on sight. Hollenbeck's awareness that the informant correctly described defendant's car and license plate is relevant, as is the officer's knowledge that the Number Nine Game Room was not an unlikely destination for the teenagers described in the tip.

Developments that afternoon on Main Street served to further corroborate the informant's story. The officers did not see defendant's Camaro cross the river bridge, so they could not be sure that defendant had come across the bridge from Streator as predicted. However, the officers did observe defendant approaching from the direction of the bridge within five minutes of the time stated in the tip. In spite of the treacherous conditions that prevailed on area roads, the informant had accu-

rately specified a nearly precise arrival time. In addition, defendant traveled in his own car and with the friend that the informant described. Also as predicted, defendant proceeded north on Main Street and parked near the Game Room.

The informant had advised Hollenbeck that the LSD would be in a small container. As defendant alighted from his car, he clutched a small item that his closed hand nearly concealed. Hollenbeck, who saw something in defendant's hand, was justifiably suspicious when defendant declared that he was holding nothing. Directly after this evasion, defendant attempted to remove his hand from Hollenbeck's view. These events concededly do not establish guilt. However, when viewed in light of the other verified details, they do tend to confirm the crux of the tip, that defendant carried some LSD in a small package.

We conclude that, at this point, Hollenbeck had reasonable grounds to infer that defendant was committing a crime. His next act, that of arresting defendant, therefore comports with statutory and constitutional standards. Under these circumstances, the search incident to arrest and the seizure of the LSD tablets were also lawful.

The informant's proven trustworthiness had been substantially reaffirmed during the moments preceding the arrest. Virtually every detail of the informant's tip was confirmed prior to the arrest.

Defendant claims that the corroboration in this case means little because the officers only confirmed innocent activity on defendant's part. He also contends that corroboration proves nothing about an informant's basis of knowledge, an aspect of the instant tip about which we concededly have no direct information.

However, we are not persuaded that these considerations negate the existence of probable cause in this

case. In *People v. Gates,* we relied on *Whiteley v. Warden* (1971), 401 U.S. 560, 567, 28 L. Ed. 2d 306, 312-13, 91 S. Ct. 1031, 1036, in stating that corroboration of innocent detail cannot support a finding of probable cause. (*People v. Gates* (1981), 85 Ill. 2d 376, 390.) However, we now note our agreement with Justice White, who stated in his *Illinois v. Gates* concurrence that the question is not whether the events observed by the police are innocent or incriminating. Instead, the proper focus is "whether the actions of the suspects, whatever their nature, give rise to an inference that the informant is credible and that he obtained his information in a reliable manner." 462 U.S. 213, 269, 76 L. Ed. 2d 527, 568, 103 S. Ct. 2317, 2348 (White, J., concurring).

Turning next to defendant's claim that corroboration cannot prove a proper basis of knowledge, we again reject defendant's contention. In *Spinelli v. United States,* which endorsed the principle that corroboration could cure a tip that otherwise did not meet *Aguilar* requirements, the Supreme Court indicated that corroboration would not only establish an informant's veracity, but also would support an inference that an informant obtained his story reliably. (*Spinelli v. United States* (1969), 393 U.S. 410, 417-18, 21 L. Ed. 2d 637, 644, 89 S. Ct. 584, 589-90.) This court in the past has viewed substantial corroboration as supportive of both prongs of the *Aguilar* test. (See *People v. Winters* (1983), 97 Ill. 2d 151, 161; *People v. Dillon* (1970), 44 Ill. 2d 482, 485-86.) We have previously noted that in *Illinois v. Gates,* the Supreme Court stated that, under the totality-of-circumstances analysis adopted in that case, a deficiency in one prong of the traditional test of an informant's tip may be compensated for in determining the overall reliability of the tip by a showing as to the other. The court set forth a specific example by stating:

"If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip." (*Illinois v. Gates* (1983), 462 U.S. 213, 233, 76 L. Ed. 2d 527, 545, 103 S. Ct. 2317, 2329.)

Defendant cites *State v. Ruffin* (La. Feb. 27, 1984), 35 Crim. L. Rep. (BNA) 2006, to support his claim that, where there is no information about an informant's basis of knowledge, the tip cannot meet *Illinois v. Gates* probable-cause requirements, even when the informant is of proved reliability. In *Ruffin*, the Louisiana Supreme Court considered a tip from an informant of well-proved reliability. However, the informant had given no information about his basis of knowledge, and he had provided only a few details about the alleged illegal activity. Police detectives corroborated just one detail before arresting and searching the defendant. The Louisiana court, which found that probable cause had not been established, did not hold that corroboration could never operate to cure such a tip. Rather, the court explained that, "[w]ithout further corroboration, we find no probable cause for the arrest when examining this tip under the totality of the circumstances." (35 Crim. L. Rep. (BNA) 2006, 2007.) As such, we regard the Louisiana decision as consistent with the one we make in the case at bar. The facts of this case are easily distinguishable from those of *Ruffin*.

In our case, not only had the informant proved reliable in previous cases, but nearly every aspect of the information he supplied in the present case was corroborated. The balanced assessment of the informant's tip in this case dictated by the holding in *Illinois v. Gates* causes us to conclude that the officer reasonably relied upon this information. The tip, in conjunction with the

evasive conduct of the defendant when confronted by the officer, furnished probable cause to believe that he was engaged in unlawful conduct. The trial court therefore did not err in failing to suppress the evidence. We find that the appellate court erroneously reversed the defendant's conviction.

For the above reasons, the judgment of the appellate court is reversed and the judgment of the circuit court of La Salle County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE WARD, concurring:

I concur in the opinion of the court.

Illustrating the developing interest in State constitutionalism, a national conference on the development of State constitutional law, co-sponsored by the Conference of Chief Justices, the National Center for State Courts, and the Marshall-Wythe School of Law, was held this year, and the American Bar Association announced that one of the topics in its Appellate Judges Seminar series will be "The Use of State Constitutions." This seminar will address questions such as whether State courts may reach different conclusions under State constitutions from those the Supreme Court has reached under the Federal Constitution and, in the event of differences, which shall prevail.

In some of the growing literature and in judicial opinions regarding State constitutions, there appear statements showing less than a full understanding of the character of constitutions and the principles that guide their judicial interpretation. It has even been stated, and in other instances implied, that a State court is free to interpret its constitution as it wishes as long as its interpretation is not more restrictive than the interpretation the Supreme Court has given parallel provisions of the

Constitution of the United States. A State may not, of course, reduce the rights assured by the Federal Constitution, and it is equally clear that a State may place greater restrictions on its own power and authority than the Federal Constitution, as read by the Supreme Court, has done.

With similarity to the principle governing statutory construction, a court, in interpreting a constitution, is to ascertain and give effect to the intent of the framers of it and the citizens who have adopted it. In *Drury v. County of McLean* (1982), 89 Ill. 2d 417, 422-23, citing what this court pronounced in *People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520, 31 Ill. 2d 197, we said: "We have previously acknowledged that in construing the Constitution the true inquiry concerns the understanding of the meaning of its provision by the voters who adopted it. However, the practice of consulting the debates of the members of the convention which framed the constitution has long been indulged in by courts in determining the meaning of provisions which are thought to be doubtful. (*People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520, 527.) The debates, therefore, aid in determining the intent of the drafters of the Constitution." (See also *Continental Illinois National Bank & Trust Co. v. Zagel* (1979), 78 Ill. 2d 387, 397.) That it is generally accepted that courts must look to the intent of the adopters and framers as controlling there can be no doubt. To illustrate: American Jurisprudence, 2d, under *Constitutional Law*, citing Federal decisions and decisions from 25 States observes: "The fundamental principle of constitutional construction is that effect must be given to the intent of the framers of the organic law and of the people adopting it. This is the polestar in the construction of constitutions, all other principles of construction are only rules or guides to aid in the determination of the intention of the constitution's framers."

16 Am. Jur. 2d *Constitutional Law* sec. 92, at 418 (1979).

If these principles of constitutional construction were to be ignored critics not unreasonably would declare it judicial arrogance for courts to say that their power to construe constitutions was limited only by the restraints courts might impose upon themselves. Courts are not legislatures, and neither are they constitutional framers and adopters of constitutions. What Justice Powell said in another context is not without relevance: "We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch." *United States v. Richardson* (1974), 418 U.S. 166, 188, 41 L. Ed. 2d 678, 695, 94 S. Ct. 2940, 2952 (concurring opinion).

The majority holds that the constitutional delegates did not manifest an intent to expand the protection afforded by the fourth amendment to the Constitution, other than to add provisions giving protection against eavesdropping and invasions of privacy. That this was a conscious decision of the convention appears from the fact that the delegates were given instructions as to the role they were to play as drafters of the new constitution as to the possible consequences of actions they might take. Delegate Elmer Gertz, chairman of the Bill of Rights Committee, has given a fascinating report of much that occurred during the proceedings of the constitutional convention. (E. Gertz, For The First Hours of Tomorrow: The New Illinois Bill of Rights (1972).) In it he tells that the then governor of Illinois had a series of research papers that had been prepared by the Constitution Research Group sent to all of the delegates both before and during the convention. Two of the papers concerned problems which were to come before the Bill of

Rights Committee and another was a general introduction to constitution-making and contained much material on the Illinois bill of rights. The group's research papers were later published as: Con-Con: Issues for the Illinois Constitutional Convention (1970).

Through these research papers the delegates were given information that appears relevant in determining whether the delegates, in drafting section 6 of the bill of rights, did or did not intend to confer rights and protections beyond those given under the fourth amendment.

The delegates were informed:

"Although most important bill of rights provisions have thus become 'federalized,' there is a clear, continuing justification for state bills of rights. First, the state may grant greater and more far-reaching protection to its citizens than federal decisions require. For instance, the Illinois Bill of Rights does provide greater protection in the case of damages for property taken or 'damaged' for public use by eminent domain. The federal Bill of Rights as applied through the Fourteenth Amendment merely establishes the minimum amount of protection afforded, leaving the states free to impose more stringent requirements if they choose to do so. In the past the minimum required under the Fourteenth Amendment has all too often been the maximum provided by the states, but there is no reason why this should persist into the future." Grad, *The State Bill of Rights,* in Con-Con: Issues for the Illinois Constitutional Convention 32-33 (1970).

In a paper entitled "The State Constitution: Its Nature and Purpose," the delegates were instructed and cautioned:

"In any revision of a state constitution, the existing declaration of rights should be examined to determine whether some provisions are no longer necessary, whether some should be clarified or expanded, and whether new basic rights should be recognized. Moreover, in view of the progressive extension in recent years of provisions of the federal Bill of Rights to the states, on

the theory that they are fundamental rights protected against the states by the Fourteenth Amendment, the corresponding provisions of the Illinois Constitution should be examined to see whether they accord with the federal standard applicable to the states.

A word of caution may be introduced here. Courts follow the general rule of construction that words carried forward verbatim from an earlier constitution to a revised constitution also carry forward the accumulated gloss of judicial interpretation." Kaupler, *The State Constitution: Its Nature and Purpose*, in Con-Con: Issues for the Illinois Constitutional Convention 24-25 (1970).

The majority has noted that the delegates, in drafting section 6, basically followed the language and provisions of section 6 of the preceding constitution with these exceptions: a right of the people to be free from invasions of privacy and a right against interceptions of communications by eavesdropping devices or other means were added.

It appears that the instruction given the delegates by the research papers was not ignored by the delegates. For example, in discussing the Illinois bill of rights, the research papers noted that Illinois, in the then-existing bill of rights, did not have an express guarantee of equal protection of the laws and that an adequate clause ought to be considered by the delegates for inclusion in the new bill of rights. (Grad, *The State Bill of Rights*, in Con-Con: Issues for the Illinois Constitutional Convention 41-42 (1970).) The delegates responded to the recommendations, and the constitution that was submitted by the delegates to the voters contained a provision assuring equal protection of the laws. Too, the papers noted that protections against illegal wiretapping and "bugging" might be considered by the delegates for express constitutional inclusion. It is interesting to note that the delegates did expand the search-and-seizure provisions in the proposed constitution to include a guaran-

tee of freedom from unreasonable eavesdropping and invasions of privacy. Grad, *The State Bill of Rights*, in Con-Con: Issues for the Illinois Constitutional Convention 45-46 (1970).

The research papers should not be overlooked in any search to determine the mind of the convention.

JUSTICE CLARK, specially concurring:

Although I agree with the result reached by the majority, I cannot agree that, because in the past we have looked to the Supreme Court for guidance and to make sure that our citizens have been afforded at least the minimum Federal requirements under the Constitution, we have in essence adopted the Supreme Court's interpretation of any amendment of the Federal Constitution as our interpretation of similar provisions of our own constitution. There is nothing which prevents this court from interpreting our constitution as affording greater protection than similar provisions of the Federal Constitution.

In *People v. Hoskins* (1984), 101 Ill. 2d 209, a recent case of this court, the issue was whether the warrantless search of the defendant's purse was in violation of the fourth amendment (U.S. Const., amend. IV), and section 6 of the Illinois bill of rights (Ill. Const. 1970, art. I, sec., 6). In that case, there was an interplay between section 108—1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 108—1), which delineates the instances when a police officer may lawfully search a person incident to a lawful arrest, and the fourth amendment and section 6. The State had argued that *New York v. Belton* (1981), 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860, was controlling in *Hoskins*. The majority agreed. *Belton* involved a search for cannabis in the pockets of the defendant's coat that was located within an automobile after the arresting officer had ordered the

defendant from his car and detected the odor of burnt marijuana. In my dissent in *Hoskins,* I stated:

> "Even if the State's interpretation of *Belton* was correct, established Illinois law cannot be broadened in the scope of a search incident to an arrest by the Supreme Court's decision in that case. The Illinois legislature has enacted a statute on the subject of a search incident to an arrest, and it is controlling here. While the Supreme Court may change the law from a Federal constitutional standpoint, Illinois courts must still follow the Illinois Code of Criminal Procedure. It is perfectly proper for Illinois to grant more protection to its citizens from unwarranted intrusions into their private belongings than the minimum Federal requirements under the fourth amendment to the Federal constitution." *People v. Hoskins* (1984), 101 Ill. 2d 209, 227-28 (Clark, J., dissenting).

I believe the majority's stance on this issue is dangerous because it limits our power to interpret our own State Constitution in the future. The evidence used against this defendant was admissible under both Federal and State constitutions, and it is unnecessary to hold that there are no circumstances where article I, section 6, of the Illinois Constitution could provide greater individual protection.

Under the majority's analysis, this court would be precluded from protecting the civil liberties of Illinois citizens should the United States Supreme Court decide to consistently favor police efficiency over the rights of the accused. Although the majority's reasoning may seem harmless today, it would preclude this court from protecting the individual liberties of Illinois citizens should such protection become essential in the future.

During the era of the Warren court, this country saw a wave of judicial activism in the Federal judiciary largely because State courts, particularly in the Deep South, were unwilling to provide the most basic protections to citizens of their State. (See generally Brennan,

*State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489 (1977).) During the era of the Burger court, we have seen the role of the State and Federal judiciary reversed. Today, the United States Supreme Court has been cutting back on the individual liberties provided by the Warren court, while State supreme courts have attempted to protect civil liberties in State constitutions. See *Michigan v. Long* (1983), 463 U.S. 1032, 1065, 77 L. Ed. 2d 1201, 1231, 103 S. Ct. 3469, 3489 (Stevens, J., dissenting).

This tradition of judicial independence has a long history in Illinois. This is a court that banned prayer in public schools 50 years before the United States Supreme Court (compare *People ex rel. Ring v. Board of Education* (1910), 245 Ill. 334, with *Engel v. Vitale* (1962), 370 U.S. 421, 8 L. Ed. 2d 601, 82 S. Ct. 1261) and adopted the exclusionary rule decades before the United States Supreme Court held this rule applicable to the States (compare *People v. Brocamp* (1923), 307 Ill. 448, with *Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684). Thus, the idea that the Illinois Constitution is co-extensive with the United States Constitution is a recent theory without support in the prior decisions of this court.

It is true that some States have held that their State constitutions provide no greater protection than the Federal Constitution. Alabama and Mississippi have adopted this point of view. (*Hill v. State* (Ala. 1979), 366 So. 2d 318; *McCrory v. State* (Miss. 1977), 342 So. 2d 897.) However, a majority of jurisdictions that have considered the question have ruled that State constitutions can provide greater protection of civil liberties than the United States Constitution. (See *People v. Hoshowski* (1981), 108 Mich. App. 321, 310 N.W.2d 228; *State v. Flores* (1977), 280 Or. 273, 570 P.2d 965; *Bierkamp v. Rogers* (Iowa 1980), 293 N.W.2d 577; *Reeves v. State* (Alaska

1979), 599 P.2d 727; *Miller v. State* (Tenn. 1979), 584 S.W.2d 758; *People v. Williams* (1978), 93 Misc. 2d 93, 402 N.Y.S.2d 289; *State v. Ringer* (Wash. 1983), 674 P.2d 1240; *State v. Kaluna* (1974), 55 Hawaii 361, 520 P.2d 51; *People v. Sporleder* (Colo. 1983), 666 P.2d 135; *People v. Neville* (S.D. 1984), 346 N.W.2d 425.) I believe that Illinois should continue to adhere to the majority position rather than adopt the minority viewpoint expounded by Alabama and Mississippi.

As the California Supreme Court has noted:

"It is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of Rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse." *People v. Brisendine* (1975), 13 Cal. 3d 528, 550, 531 P.2d 1099, 1113, 119 Cal. Rptr. 315, 329.

The majority misconstrues Illinois case law to justify the adoption of the Alabama approach. *People v. Tillman* (1953), 1 Ill. 2d 525, 529, stands for the proposition that the Federal and State constitutions should be construed alike if they are "liberally construed in favor of the accused." This is hardly the situation in the case at bar, since we are holding in favor of the State.

I disagree with the majority's belief that "[w]e must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution." 103 Ill. 2d at 245.

The Illinois Constitution, like the United States Constitution, is a living document. I have found no references to airplanes, prescription drugs, or wiretapping in the United States Constitution, or in the debate that

preceded its adoption. (See generally J. Madison, *The Federalist Papers* (rev. ed. 1961).) This silence did not prevent the United States Supreme Court from dealing with these questions. Similarly, I believe that the absence of certain comments at the Illinois constitutional convention should not tie our hands. The Illinois Constitution, like the United States Constitution, is framed in general terms to prevent the document from being 19,000 pages long and to retain flexibility to deal with unforeseen questions. The majority opinion precludes such flexibility.

Justice Stevens criticized the approach taken by the majority when he examined a restrictive interpretation of the Massachusetts Constitution:

"In my view, the court below lost sight of this truism, and permitted the enumeration of certain rights in the Fourth Amendment to disparage the rights retained by the people of Massachusetts under Art. 14 of the Massachusetts Declaration of Rights. It is of course not my role to state what rights Art. 14 confers upon the people of Massachusetts; under our system of federalism, only Massachusetts can do that. The state court refused to perform that function, however, and instead strained to rest its judgment on federal constitutional grounds.

Whatever protections Art. 14 does confer are surely disparaged when the Supreme Judicial Court of Massachusetts refuses to adjudicate their very existence because of the enumeration of certain rights in the Constitution of the United States. The rights conferred by Art. 14 may not only exceed the rights conferred by the Fourth Amendment as construed by this Court in Gates, but indeed may exceed the rights conferred by the Fourth Amendment as construed by the state court. The dissent followed the approach of the majority to its logical conclusion, stating that there 'appears to be no logical basis, and no support in the case law, for interpreting the term "cause" in Art. 14 differently from the "probable cause" requirement of the Fourth Amendment.' Pet. for Cert. 9a. 'The right question,' however, 'is not whether a

state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand. The answer may turn out the same as it would under federal law. The state law also may be less protective. In that case the court must go on to decide the claim under federal law, assuming it has been raised.' Linde, E Pluribus—Constitutional Theory and State Courts, 18 Ga. L. Rev. 165, 179 (1984).

It must be remembered that for the first century of this nation's history, the Bill of Rights of the Constitution of the United States was solely a protection for the individual in relation to federal authorities. State constitutions protected the liberties of the people of the several States from abuse by state authorities. The Bill of Rights is now largely applicable to state authorities and is the ultimate guardian of individual rights. The States in our federal system, however, remain the primary guardian of the liberty of the people. The Massachusetts court, I believe, ignored this fundamental premise of our constitutional system of government. In doing so, it made an ill-advised entry into the federal domain." *Massachusetts v. Upton* (1984), 466 U.S. ____, ____, 80 L. Ed. 2d 721, 730-31, 104 S. Ct. 2085, 2090-91 (Stevens, J., concurring).

Justice Brandeis noted that our system of government allows States a certain degree of latitude in running their own affairs. (*New State Ice Co. v. Liebmann* (1932), 285 U.S. 262, 311, 76 L. Ed. 747, 771, 52 S. Ct. 371, 386-87 (Brandeis, J., dissenting, joined by Stone, J.).) I prefer this latitude to the crushing degree of uniformity advocated by the majority.

JUSTICE GOLDENHERSH, dissenting:

I dissent, and would affirm the judgment of the appellate court. Prior to discussing what I perceive to be the errors in the majority's holding the search valid, I state my concurrence with the views expressed by Jus-

tice Clark concerning this court's interpreting our constitution to afford greater protection than do purportedly similar provisions of the Federal Constitution. As I said in my dissent in *People v. Exline* (1983), 98 Ill. 2d 150, 157, "we are not required to blindly follow the action taken by the Supreme Court in determining the standards applicable under our own constitution."

The record in this case contains no evidence of the informant's basis of knowledge and the allegedly corroborative evidence of defendant's activity, in lieu thereof, is utterly meaningless. The value of evidence as corroborative of a fact related by an informant must be determined by the surrounding circumstances, and as the Supreme Court and this court have said on numerous occasions, the presence of probable cause is to be determined on a common sense basis. In *Draper v. United States* (1959), 358 U.S. 307, 3 L. Ed. 2d 327, 79 S. Ct. 329, the informant's story was that a certain described individual would alight from a certain train on either of two days wearing certain described clothing and carrying a tan zipper bag. The fact that an individual matching this description alighted from a train which had just arrived at the Denver railway station from Chicago was of some corroborative value. In contrast here, we have the fact that the defendant would be driving his automobile with which the police officer was already familiar, bearing a certain license plate, the number of which was already known to the police officer, and would go to the Number Nine Game Room, a known teenage "hangout," apparently the only such place in the city of Marseilles, and where defendant went almost every day. The only information that the police officer obtained from the informant which he did not already have was that the car would be arriving from the general direction of Streator. Considering that this is one of the main traveled highways through Marseilles, the fact that the automobile ar-

rived from that direction is hardly corroborative of criminal activity.

On inquiry, the police officer could probably have determined in the Number Nine Game Room, without the aid of an informant, that the defendant stopped there almost every day and would probably arrive at approximately the time at which he did. Under these circumstances, the admitted past reliability of the informer does not serve to fill the gap left by complete lack of evidence of the basis of knowledge.

In its opinion in *Gates* the Supreme Court did not obviate the requirement that there appear in "the totality of the circumstances" a basis for determining the basis of knowledge of the unnamed informant. The Supreme Court said:

> "We agree with the Illinois Supreme Court that an informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of his report." *Illinois v. Gates* (1983), 462 U.S. 213, 230, 76 L. Ed. 2d 527, 543, 103 S. Ct. 2317, 2327.

The result of this decision is to apply an amorphous concept of "totality of the circumstances" without guidelines or minimum requirements. I am of the opinion that further application of this "test" will, as suggested by Mr. Justice White in his concurring opinion in *Illinois v. Gates* (1983), 462 U.S. 213, 272, 76 L. Ed. 2d 527, 570, 103 S. Ct. 2317, 2350 (White, J., concurring), "foretell an evisceration of the probable-cause standard."

JUSTICE SIMON joins in this dissent.