THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
RUBEN RODRIGUEZ, Defendant-Appellee.

First District (2nd Division)   No. 84—2583

Opinion filed March 11, 1986.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

John M. Cutrone and Michael Jay Green, both of Chicago, for appellee.

JUSTICE STAMOS delivered the opinion of the court:
Defendant was charged by information with the offense of unlawful possession with intent to deliver more than 30 grams of heroin. (Ill. Rev. Stat. 1983, ch. 56½, par. 1401(a)(1).) After a hearing in the

circuit court of Cook County, defendant's motion to suppress this evidence was granted, and the State now appeals (87 Ill. 2d R. 604(a)(1)), contending that the trial court's order was against the manifest weight of the evidence.

The record shows that about 10:30 p.m. on September 11, 1983, police officers recovered 1,509 grams of heroin from the trunk of an automobile being driven by defendant in the area of 2455 North Sacramento in Chicago. Police stopped defendant after receiving a tip from an informant that he was going to make a delivery of over a kilogram of heroin within the next hour and would be driving northbound on Sacramento toward Diversey in a white Mustang convertible. When police officers observed defendant driving that type of vehicle in that location, they executed a stop and discovered heroin in the trunk of the car. As a result defendant and the two other occupants of the vehicle, Ismeel Miranda and Luis Marquez, were arrested.

Following his arrest, defendant filed a motion to suppress the evidence obtained therefrom alleging that the stop and the search of the vehicle was without probable cause or legal process. At the hearing on the motion, the following testimony was adduced by the defense.

Ismeel Miranda testified that he is an international recording artist and on September 10, 1983, was in Chicago for a concert. At the time of his arrest he was being driven to the airport via a friend's house after spending the afternoon with defendant and Marquez discussing the possibility of a tour for him in this country as well as boxing promotions. The three were scheduled to meet at O'Hare Airport before his 12:30 p.m. flight, but defendant did not arrive until he was about to board, so he rescheduled his departure and spent the afternoon at Marquez' house discussing business. About 7 p.m. they went to a restaurant for dinner and remained there until approximately 10 p.m., when they left in defendant's car. They intended to stop at a fan's house before going on to the airport but were stopped on the street and ordered out of the car by three police officers, then were placed under arrest after one of the officers announced that he had found "some goodies." Miranda further stated that from the time he met defendant in the airport until they were stopped by the police, defendant never left his sight, and he never saw defendant go into another room or make a telephone call.

Defendant testified that he is the proprietor of Ruben's Auto Sales located at 3150 North Cicero and has also worked with Marquez as a boxing promoter. He stated that he had purchased a 1966 white Ford Mustang about a week before his arrest and affixed dealer

plates to it. He kept the keys for the car on the keyboard in his dealership office and explained that his brothers Roberto and Daniel Flores also worked there.

Defendant further testified that about noon on September 11, 1983, his girl friend drove him from her apartment to his business, a journey of about 15 minutes. He then took the title and the keys for the Mustang and drove about 20 minutes to the U.S. Arena Gym at Division and Damen to meet with Marquez and Miranda; he had previously worked with Marquez, but had never met Miranda. When he arrived at the gym, he learned that they were already gone, so he proceeded to the airport and found them there. The three men went on to Marquez' house, where they spent the afternoon, then had dinner together at a restaurant. Miranda gave him the address of a person he wanted to see, and, as they proceeded to this address, they were stopped by three plain clothes officers on Sacramento about five blocks from this residence.

When they were stopped, one of the officers asked for his driver's license and inquired as to the ownership of the car, and in response defendant produced his license and the car title. The officer also conducted a pat-down search of his person and asked him to open the trunk. One of the officers, however, took the keys from the ignition and asked defendant which one opened the trunk; defendant told him which one it was, then stood within a few feet of the officer as he opened it. After doing so the officer told him that he had found something there that he intended to use against him. Defendant asserted at the hearing that he had not looked inside the trunk of the car since he had purchased it a week before.

The State then introduced Officer Gregory Salvi who testified that on September 11, 1983, he was assigned to the 25th District Tactical Unit and that evening was working with Officer Kane and Sergeant Malinski. About 10 p.m. he had a telephone conversation with a confidential informant at Belmont and Harlem who told him that defendant, who was known to the officers, was going to make a delivery of over a kilogram of heroin within the next hour and that he would be driving a white Mustang convertible with dealer license plates northbound on Sacramento towards Diversey. During the last two years, this informant had given Salvi information regarding controlled substances on three occasions, and based on this information he had recovered controlled substances.

After speaking with this informant, Salvi explained the situation to his fellow officers, and they proceeded past defendant's home at 2827 North Mozart, then went on to Sacramento and Diversey. Officer

Salvi recounted that, as they drove southbound on Sacramento, he observed a white Mustang bearing dealer plates coming from the opposite direction, then executed a U-turn and pulled up next to the car. At this point Salvi recognized defendant, whom he had never met but had seen on the street, as the driver. The officers then curbed the car at 2455 North Sacramento, an area outside of their district, and exited their vehicle.

Salvi approached the driver's side and asked defendant for his driver's license. In response defendant displayed his driver's license, and also produced the title for a 1966 Ford Mustang. There were two other men in the vehicle, and they and defendant stepped over to the curb area where Salvi talked to them while the other two officers searched the vehicle. Kane then came over to this area with a ring containing several keys and asked defendant which one opened the trunk. At that point, defendant took the keys from his hand and said, "I will open it," then did so after walking over to the trunk with Kane. The trunk contained a brown paper bag, and as soon as the trunk was opened, Salvi noticed a strong smell emanating from the bag, which, from his experience, led him to believe it contained heroin.

During cross-examination, Salvi stated that he made a report of the incident about two hours after the seizure on September 11, 1983, and testified at a preliminary hearing on the matter about a month later. He acknowledged that at the preliminary hearing he had stated that the informant did not tell him that the car would be bearing dealer plates, but at the hearing on the motion stated that he was mistaken in that testimony. He also acknowledged that his unit had been conducting a narcotics-related investigation of the Rodriguez and Flores family for several months.

Salvi further stated that on the night of the incident, he waited for his informant's call and recognized his voice on the telephone. This was the fourth time that he had obtained information from him, and on the last occasion he obtained a search warrant based on the information provided; however, he could not recall exactly when that occurred and conceded that it might have been more than a year ago. He asked his informant whether he had the license plate number of the car, which he did not, but did not ask him if he had seen any drugs. The informant did not tell him that there were drugs in the car, or whether the delivery was going to take place in the street or in an apartment. Salvi also did not ask the informant how he had obtained his information or whether he had sampled any of the narcotics; he knew that his informant used heroin and cocaine but did not

know if he was an addict.

Defense counsel further elicited that Salvi first observed defendant's vehicle traveling in the opposite direction; however, the officer did not recall whether the car had front license plates on it and explained that it went by so quickly, he was unable to see the plates. When he approached defendant's car, he did not ask defendant anything about a drug transaction, was not sure that there were drugs in the car and found no indication of drugs until the trunk was opened. Salvi also stated that defendant was not asked to open the car trunk but did so voluntarily; however, his report and grand jury testimony indicated that he previously had stated that defendant was asked to open the trunk. At the hearing on the motion he also stated that he was standing about 10 feet away from the trunk when it was opened and did not observe anything until he walked over and smelled the odor coming from it, but he told the grand jurors that he had detected the odor as soon as the trunk was opened.

After hearing the arguments of counsel the trial court sustained defendant's motion to suppress. In doing so, the court stated that it could not reconcile the fact that the officer had been impeached and concluded from the totality of the facts and circumstances presented that the officer did not testify truthfully. The court believed that its evaluation was borne out by the police reports and the testimony given by the officer under oath on two prior occasions, testimony it believed was changed many times to fit into a set of facts which could satisfy the court. Following this decision, the State filed a certificate of impairment and this appeal follows.

The State contends here that the trial court's decision is against the manifest weight of the evidence because the record shows that the stop and search of defendant's automobile was based upon information received from a previously reliable confidential informant and exigent circumstances precluded the officers from obtaining a warrant. The State maintains that the facts and circumstances known to Officer Salvi when he stopped defendant's car justified his belief that the automobile contained over a kilogram of heroin, that the information provided by the informant was confirmed by the officer's subsequent investigation and that since there was no time to obtain a warrant, the search of defendant's automobile was valid.

■■ Initially we note that on a motion to suppress evidence defendant has the burden of proving that the search and seizure were unlawful (*People v. Hoskins* (1984), 101 Ill. 2d 209, 461 N.E.2d 941; Ill. Rev. Stat. 1983, ch. 38, par. 114—12(b)), and the trial court's finding in this matter will not be disturbed on review unless it is mani-

festly erroneous (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147). When a police officer has proceeded without a warrant to search, to seize evidence or to arrest a person, the trial court making a probable cause determination is to apply standards at least as stringent as those that guide a judge in deciding whether to issue a warrant. (103 Ill. 2d 226, 236, 469 N.E.2d 147.) In *Tisler* the Illinois Supreme Court adopted the "totality of the circumstances" standard announced in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, for resolving probable cause questions under the Illinois Constitution which involve an informant's tip (*People v. Tisler* (1984), 103 Ill. 2d 226, 246, 469 N.E.2d 147), and this standard has since been held applicable to situations, such as the one at bar, where a warrantless search is conducted on the basis of an informant's tip. *People v. Ross* (1985), 133 Ill. App. 3d 66, 478 N.E.2d 575.

■ Under the *Gates* standard, probable cause based upon an anonymous informant's tip is determined by whether, after examining all the circumstances including the veracity and basis of knowledge of the person supplying the information, there is a fair probability that contraband will be found in a particular place. (*People v. Ross* (1985), 133 Ill. App. 3d 66, 71, 478 N.E.2d 575.) The *Gates* court rejected the rigid and mechanical application of the two-pronged test previously used to determine probable cause in situations involving an informant, but held that the informant's "veracity," "reliability" and "basis of knowledge" are highly relevant in determining the value of his report, and that these factors are to be examined as a whole along with the other facts presented. *Illinois v. Gates* (1983), 462 U.S. 213, 230-34, 76 L. Ed. 2d 527, 543-45, 103 S. Ct. 2317, 2328-30; see also *People v. McCoy* (1985), 135 Ill. App. 3d 1059, 482 N.E.2d 200.

■ In the instant case, the informant, who had previously given information to Salvi, purportedly told him that defendant would be driving a white Ford Mustang convertible with dealer plates northbound on Sacramento toward Diversey and was expected to make a delivery of a large quantity of heroin within the next hour. The trial court in examining the reliability of the informant noted that he may not have given the police officer any information in over a year and that no basis for his knowledge was provided in the record. The court also observed that the singular set of facts presented would be insufficient to satisfy the issuance of a warrant without further inquiry. Although the court agreed with the State that there were significant variances in the testimony of the defense witnesses, particularly with regard to time, and noted that these variances referred to periods well before the information was allegedly received and the incident

took place, the court commented that it could not overlook the fact that the officer had been impeached and concluded that he was not telling the truth.

In ruling on a motion to suppress, it is the province of the trial court to determine the credibility of the witnesses and the weight to be given their testimony, and its findings will not be disturbed on review unless they are contrary to the manifest weight of the evidence. (*People v. Wiggins* (1976), 45 Ill. App. 3d 85, 358 N.E.2d 1301.) We do not believe this to be such a case.

After reviewing the record in light of the applicable standard (*People v. Tisler* (1984), 103 Ill. 2d 226, 249, 469 N.E.2d 147), we agree with the trial court that the reliability of the informant or his existence is dubious. The officer testified that on three occasions the information supplied by the informant led to the recovery of controlled substances; however, he could not recall with any specificity when these tips were given and ventured that the last one could have been more than a year before. In addition, the basis on which the tip was founded was equally uncertain. There was no indication as to how the informant obtained his information that he witnessed defendant in possession of the substance, how he knew the substance was heroin or where the transfer was to take place. While these deficiencies would not necessarily render the informant's tip untrustworthy in the presence of strong corroborating circumstances established through independent police investigation, we find this area also lacking under the totality of the circumstances analysis. See *People v. Ross* (1985), 133 Ill. App. 3d 66, 72, 478 N.E.2d 575.

The State maintains that the details of the tip were corroborated by the subsequent investigation of the officers, citing specifically that defendant was located on Sacramento heading toward Diversey in a white Ford Mustang convertible with dealer plates. However, the officer was impeached with his prior testimony on the information he was given regarding the license plates, and also he testified that, when he first observed the car, it was being driven in the opposite direction, yet he did not observe the front license plate. More importantly, however, the court found that the officer did not testify truthfully and attempted to conform his testimony and report to a set of facts which could satisfy the court.

The credibility of Officer Salvi was a paramount consideration in the resolution of this case, and the trial court expressly disavowed his testimony. (See *People v. Redmond* (1983), 114 Ill. App. 3d 407, 449 N.E.2d 533.) In light of the trial court's superior position to evaluate this factor, we choose to defer to its judgment (see *People v. De*

*Jesus* (1981), 94 Ill. App. 3d 1018, 419 N.E.2d 510), and we conclude under the totality of the circumstances presented on this record that its decision was not against the manifest weight of the evidence.

Judgment affirmed.

BILANDIC and SCARIANO, JJ., concur.