THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
PATRICK DOYLE, Defendant-Appellant.

First District (5th Division)   No. 1—90—1234

Opinion filed July 17, 1992.—Modified opinion filed September 11, 1992.

Rita A. Fry, Public Defender, of Chicago (Dennis E. Urban, Assistant
Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Janet Mahoney, Special Assistant State's Attorney, and Renee Goldfarb and Leslie A. Quade, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Defendant, Patrick Doyle (Doyle), was charged by indictment with aggravated arson, arson, conspiracy to commit aggravated arson and conspiracy to commit arson. After a bench trial, defendant was found guilty on all four counts. The court entered judgment against defendant only on the aggravated arson and arson counts. Defendant was sentenced to serve six years in the Illinois Department of Corrections.

Dorothy Stirgus moved into a home at 7924 South Fairfield in Chicago on February 7, 1987. On February 17, 1987, Ms. Stirgus was in her bedroom watching television. At approximately 10 p.m., she heard a loud crashing sound. Ms. Stirgus jumped out of bed, ran to her bedroom door and opened the door. The kitchen and hallway leading up to the bedroom were engulfed in flames.

The indictment charged that on February 17, 1987, John Benoit (Benoit), John Waitman (Waitman), William English (English) and Doyle committed the offenses of aggravated arson, arson, conspiracy to commit aggravated arson and conspiracy to commit arson at 7924 South Fairfield in Chicago. The address was the residence of Dorothy Stirgus. There was a joint and simultaneous trial where Benoit had a jury trial and Waitman and Doyle had separated bench trials. Doyle is the only defendant involved in this appeal.

Prior to trial Doyle filed various motions to suppress. Separated hearings were held on such motions. The trial court denied the motions to suppress.

On appeal defendant argues: (1) The trial judge erred in denying the defendant's motion to quash his arrest and suppress evidence; and (2) the inculpatory statements made to the police at the police station were the direct result of the illegal arrest and must also be suppressed. Alternatively, the State maintains: (1) The police had probable cause to arrest the defendant; and (2) assuming *arguendo* the arrest was illegal, the defendant's statement to police at the station should not be suppressed since the statement was attenuated from the allegedly illegal arrest.

For the following reasons we affirm the decision of the trial court.

On February 20, 1987, Detective Leonard Rolston of the bomb and arson section of the Chicago police department was working on an arson case involving 7924 South Fairfield. English had been arrested on an unrelated offense and the arresting officer in that case indicated that English had pertinent information as to who committed the fire bombing at 7924 South Fairfield. Rolston talked to English in a lockup section of a police station. English initially told Rolston that he heard that Angelo Torres and Frank Manzo had perpetrated the fire bombing. On February 19, 1987, Sergeant Lowe and Detective Wesley Blaau of the human relations division picked up Frank Manzo for interrogation by the bomb and arson investigators. Lowe did not observe the interrogation. However, Lowe made a report which indicated that some investigator informed him that English exonerated Manzo.

On February 19 or 20, Rolston arranged to have English transferred from the Cook County jail to 11th and State. English talked about what occurred on February 17, 1987. In the initial conversation, English told Rolston that he had been in the area of the fire bombing, but that he had no friends there. In the subsequent version, English stated that he was with friends that night in the area of the fire bombing on 79th Street. English gave two versions before he implicated Benoit and Waitman in this case. Rolston stated that English had told another detective that Waitman and the defendant could verify his whereabouts. Rolston stated that English never made a statement which implicated himself and in fact was a confession to his part in the fire bombing. Rolston mentioned that certain physical evidence recovered from the scene corroborated English's statement. Rolston stated that English told him that these youths were making a fire bomb out of RC bottles. English told Rolston that they purchased gasoline and poured it into RC bottles.

Sergeant James Sandow of the bomb and arson section of the Chicago police department testified that he was involved in the investigation of the fire bombing that occurred at 7924 South Fairfield. Sandow stated that he learned from Rolston that English was the primary suspect in this case. Sandow stated that English had taken and failed a polygraph exam, and that he was then questioned by Rolston and gave various stories of his involvement. Sandow mentioned that it was difficult to ascertain from English what was the truth because he had mentioned several stories. Eventually, English had indicated that Benoit and Waitman were cohorts who committed this particular fire bombing. English also mentioned that

the defendant had driven the other three to a location distant from the actual scene of the occurrence, defendant was told to wait there until they returned, and when they returned, defendant drove them to wherever they lived.

On February 20, 1987, at about 2 a.m. Sergeants Sandow, Sykes and Lowe as well as Detectives Gardner, O'Meara and Blaau arrived at the defendant's house, which is located at 4232 West 81st Street in Chicago. Sandow testified that the reason that six officers went to the Doyle residence was that, due to the nature of this particular incident, the investigation was a joint effort between the bomb and arson unit and the human resource department. He stated it is police routine to have two detectives present. He further testified that Sergeant Sykes had been in the unit for not even a month and Sandow was training him, not because Sykes didn't have police experience, but rather that Sykes was totally unaware of an arson investigation. The police had no warrants. Sandow stated that the only information that he had with respect to the defendant was that he may have been unwittingly used by the other defendants to drive them to the site of the particular incident. Sandow stated that the defendant was not a target. Sandow went to the defendant's house primarily to question him to determine whether he would be any type of beneficial witness against the individuals involved in the fire bombing.

Sandow, Sykes and Lowe rang the doorbell and knocked on the door. The defendant's sister opened the door. Sandow identified himself and the other two sergeants by showing his star and identification. Defendant's sister invited the officers in and told them to have a seat. The other three police officers waited outside. The defendant's sister went upstairs to get her father, William Doyle. William Doyle identified himself as a retired Chicago police officer. Sandow talked to the defendant's father for about 10 minutes. The father asked his daughter to go in the basement and wake up the defendant. Thereafter, the defendant came upstairs. Sandow stated that the father spoke to the defendant first. Sandow stated that the father explained to the defendant that the police officers were at the house on a serious matter involving a fire bombing, and that he (defendant) was to tell the police the truth and tell the police everything he knew about this incident. Sykes testified that the father was the first person to tell the defendant to tell the truth and what he knew about the incident.

After the father talked to the defendant, Sandow asked to speak to the defendant and the defendant agreed to speak to him.

Sandow stated that he told the defendant that if he was going to tell anything, he expected it to be the whole truth without any lies whatsoever because this could be a very important day in his life. Sandow stated that frequently witnesses have lied to him and he did not want the defendant to lie to him and involve himself in something that he was not involved in. Sandow stated that the defendant was not a suspect, not in custody, and he was free to go. Neither Sandow nor anyone else gave the defendant *Miranda* warnings at his home. Sandow spoke with the defendant for about 10 to 15 minutes. There was no interrogation of any length pertaining to the fire bombing. Sandow stated that the defendant began making some statements that in his mind immediately made him (Sandow) believe that the defendant was very likely involved in this incident. Sandow could not recall the exact content of the words that the defendant said, but it was obvious to him that the defendant was beginning to incriminate himself. After these statements, Sandow told the defendant to stop. Sandow did not tell the defendant that he was under arrest. Sandow asked the defendant and his father to accompany the police to their office and discuss this further. The defendant and his father agreed to do so. Doyle went downstairs to get dressed in street clothes. Sandow stood in the doorway while Doyle got dressed.

Sandow, Sykes, and Lowe denied that there was any psychological coercion of the defendant or inducements made to him. Detective Leonard Sykes testified that he was a Chicago police officer assigned to the bomb and arson unit. He was assigned to investigate a fire bombing at 7924 South Fairfield. At approximately 2 a.m. on February 20, 1987, he went to Doyle's house. He was accompanied by Sergeants Sandow and Lowe and Detectives Gardner, O'Meara and Blaau. Sykes' testimony corroborated that of Sandow as to the officers' entry into the home and the conversation with Doyle's father. Sykes stated that the officers told Doyle who they were and then his father told Doyle to tell the officers what happened. Sykes testified:

> "A. Well, Pat [Doyle], he started talking about they had gotten together and he started talking about going in the basement and pouring the gasoline in the bottles. We said, hold it Pat. I didn't want to hear—we didn't want to hear anymore because at that point—
> Q. Why did you say hold it?
> A. At that point we hadn't told him anything about his rights or anything. At that point we had not came there to

lock him up. We thought he was going to be a witness more or less."

On February 20, 1987, at 3 a.m. Detectives Rolston and Salvatore saw the defendant at 11th and State. The defendant was not handcuffed. At this time Rolston informed the defendant of his *Miranda* rights, and the defendant said he understood them. Rolston also stated that there were no threats or inducements. Thereafter, Rolston interviewed the defendant for 15 to 20 minutes.

### TRIAL COURT'S RULING

The trial court denied the defense motion to quash arrest and suppress evidence. First, the court found that the officers originally did not have probable cause to make any sort of arrest when they went to the Doyle home. He noted that the officers had previously questioned English and that English gave certain statements; however, the officers did not acquire probable cause at that time. The court found that at the time the officers went to the Doyle home, they did not go there for the purpose of arresting Doyle for committing this crime or any other crime, but rather the officers went to the Doyle home to talk to Doyle as a witness. The officers did so based on the statements given by English and other investigations by the officers. The trial court noted that the officers were correct in going to the home and stated:

"Just as crime did not happen between the hours of 9:00 and 3:00 every day, the investigation of crimes do not occur, they occur in the officers' working 24 hours a day. These officers were working. There is no evidence that they waited in the middle of the night to go out and make an arrest at any time if they wish. *** There is not evidence that I have heard that the officers went there, barged through the door, made an illegal arrest. They knocked and rang the doorbell, and they were voluntarily admitted."

The trial court noted that evidence had been presented as to the mental capacity of Doyle's sister. The trial court stated that it was clear that this was an 18-year-old woman and that she had authority to be in that house and she had the authority to open the door. The court stated that clearly she opened the door and that even if she did not the officers did not barge in and arrest the defendant. Before talking to the defendant they requested permission from his father. The officers explained to Mr. Doyle why they were there and why they wanted to talk to Doyle. Mr. Doyle summoned the defendant.

The trial court found that the officers were properly in the home and properly conducting an investigation and it was at that time that Doyle made a statement which would give the officers reason to believe that he was a suspect in the crime. The trial court stated: "When he made the statement about going to the basement and filling up certain bottles with gasoline, that gave the officers probable cause at that time, only at that time, to make an arrest of the defendant."

The court further noted that after Doyle made the statement and the officer went to watch him dress, Doyle was not free to leave at that time but the officer felt that he had probable cause to bring him to the police station.

In another separate motion to suppress, the court found that any statements that occurred in the home before Doyle made the incriminating statement as to show his knowledge as to what was going on would be admissible and that any other statements would not be admissible until he was advised of his constitutional rights and waived those rights. The trial court also found that defendant was advised of his constitutional rights at the police station, understood those rights and waived his rights at that time. No psychological coercion was used on Doyle and no promises or threats were made to him.

A

On appeal defendant contends that his arrest was unlawful due to the lack of probable cause. The trial court found that when the defendant made the statement about going to the basement and filling up bottles with gasoline, this gave the officers probable cause at that time to make an arrest of the defendant. Defendant argues that said statement referred to by the trial court, by itself, does not show that the defendant committed the crime in question or assisted anyone in the fire bombing of the complainant's house on the night in question.

A person may be arrested without a warrant when a police officer has reasonable grounds to believe he has committed a crime. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984; Ill. Rev. Stat. 1987, ch. 38, par. 107—2(1)(c).) Probable cause exists when the police have knowledge of facts that would lead a reasonable person to believe a crime had been committed and the person arrested committed the crime. (*People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146; *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537.) Although more than mere suspicion is necessary, evi-

dence sufficient to convict is not required. (*People v. King* (1987), 157 Ill. App. 3d 76, 511 N.E.2d 685.) The court should focus on probabilities and should not be unduly technical in deciding whether probable cause existed. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317; *People v. Gutknecht* (1984), 121 Ill. App. 3d 839, 460 N.E.2d 60.) The police officer's actions in making an arrest are to be judged by the practical considerations of everyday life, keeping in mind the officer's underlying responsibility to prevent crime, to apprehend criminals and to act quickly in appraising data. (*People v. Stachelek* (1986), 145 Ill. App. 3d 391, 399, 495 N.E.2d 984, 989.) A reviewing court will not disturb a trial court's determination on a motion to quash an arrest unless the decision was manifestly erroneous. *People v. Foskey* (1990), 136 Ill. 2d 66, 76, 554 N.E.2d 192; *People v. Adams* (1989), 131 Ill. 2d 387, 546 N.E.2d 561.

On a ruling on a motion to suppress, it is the province of the trial court to determine the credibility of the witnesses and the weight to be given their testimony. (*People v. Rodriguez* (1986), 141 Ill. App. 3d 923, 929, 491 N.E.2d 53.) The trial court had the opportunity to observe the witnesses and determine their credibility. The trial court determined that the officers went to the Doyle house to conduct an investigation and that the officers were voluntarily admitted to the home. We cannot find that these were clearly erroneous findings.

■ The test for whether probable cause to arrest defendant existed depends upon the knowledge possessed by the officer at the time of the arrest. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) Defendant's statement alerted the police to the fact that he was aware of the method used to commit the crime, including the type of bottles used to make the Molotov cocktails. This fact taken together with the various statements by English that placed the defendant around the scene of the crime would lead a reasonable person to believe that Doyle had committed a crime.

Finally, a relevant factor in determining whether the officers acted properly is the seriousness and violent nature of the offense. (See *People v. Stachelek* (1986), 145 Ill. App. 3d 391, 495 N.E.2d 984; *People v. Cobb* (1983), 97 Ill. 2d 465, 455 N.E.2d 31.) The offense in the present case, the racially motivated fire bombing of a private residence, certainly is a very serious and violent crime.

Based on totality of the circumstances, we find that a reasonable person having the knowledge of the police officers in this case would believe that the defendant was involved in the crime. Since

an officer rests his decision to arrest a person on probabilities, not proof beyond a reasonable doubt (*People v. Summers* (1981), 100 Ill. App. 3d 170, 426 N.E.2d 937), we cannot find that the trial court's denial of the defendant's motion to quash the arrest was manifestly erroneous.

## B

■ Defendant further argues that since his arrest was illegal, inculpatory statements made to the police at the police station a short time after his illegal arrest must be suppressed. Since we have concluded that Doyle's arrest was proper, we must therefore conclude that his statements made thereafter were not tainted by an invalid and unconstitutional arrest.

For the all of the reasons set forth above, we affirm the decision of the trial court.

We wish to point out that this case is an example of a situation occurring far too often in the appellate court. The defendant in this case is eligible for parole two months from the date of oral argument. By the time the defendant is paroled the time to petition for a rehearing in this court most likely will not have expired and the time to petition for leave to appeal to the Illinois Supreme Court definitely will not have passed. We see far too many cases where the defendant is approaching or has passed a release date prior to the date his appeal is heard. In many appeals of this nature, delays are caused by both sides. In this particular case the notice of appeal was filed on April 27, 1990, the defendant's brief was filed November 19, 1991, and the State's brief was not filed until April 29, 1992. Delays have become the norm rather than the exception. We recognize that both the State's Attorney's office and the public defender's office have considerable caseloads; however, excuses will not eliminate the problem. It has almost become a matter of course for the parties to an appeal to request several continuances when filing their respective briefs. This opinion is not the proper forum to solve this problem; however, we hope that the communication lines will open between the various government agencies so that the problem can be solved.

Judgment affirmed.

McNULTY, P.J., and LORENZ, J., concur.