# Illinois Official Reports

## Appellate Court

*People v. Horton*, 2017 IL App (1st) 142019

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARKELL HORTON, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-2019 |
| Filed<br>Modified upon denial<br>of rehearing | March 31, 2017<br><br>June 6, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-14395; the Hon. Lawrence E. Flood, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Douglas H. Johnson, of Kathleen T. Zellner & Associates, of Downers Grove, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, Edward Wasilewski, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justice Neville concurred in the judgment and opinion.<br>Justice Pierce dissented, with opinion. |

**OPINION**

¶ 1    Chicago police officers, in their mission to "serve and protect," must remove from the city's streets illegal guns, which claim hundreds of lives each year and imperil the public's safety and security. Presumably acting on that laudable desire, an officer had a hunch, based on seeing "a metallic object" in Markell Horton's waistband, that Horton might have a handgun and pursued him. Eventually, police found a handgun hidden under a mattress in a bedroom where they found Horton, and he was charged with possession. But changes in Illinois law (in part mandated by United States Supreme Court rulings protecting the right to keep and bear arms) now hold that it is not illegal to carry a concealed handgun, as long as certain procedures are followed.

¶ 2    As judges, we are stuck between a hammer and the anvil. On the one hand, we are ever mindful of, and horrified by, the level of gun violence that continues to plague the City of Chicago. We feel confident in saying that all members of the judiciary wish for reformative solutions. But we also are mindful of our limited role in a constitutional system. We cannot sidestep or disregard instruction from both the United States and Illinois Supreme Courts to achieve a specific outcome. When we hold that precedent dictates the result here, it is not because we are naïve or "soft on crime." On the contrary, it is because we must follow, not rewrite, the established law and the facts in evidence.

¶ 3    We now turn to the specifics of Horton's appeal. Horton argues four issues: (i) the trial court improperly denied his motion to quash arrest and suppress evidence; (ii) the trial court improperly barred him from introducing registration and ownership evidence of the weapon, both before and after the State "opened the door" to the evidence; (iii) reasonable doubt; and (iv) ineffectiveness of trial counsel. In addition, this court ordered supplemental briefs on the issue of probable cause to pursue Horton "in view of the rulings in *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *People v. Aguilar*, 2013 IL 112116; and *People v. Burns*, 2015 IL 117387."

¶ 4    We hold that the trial court improperly denied Horton's motion to quash arrest and suppress evidence. The probable cause to pursue Horton was based on the officer's belief that Horton possessed a gun in violation of the aggravated unlawful use of a weapon statute (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2010)), later found unconstitutional on its face and void *ab initio*. *Aguilar*, 2013 IL 112116; *Burns*, 2015 IL 117387. As a result, the search and seizure of the gun was unlawful, and the trial court erred when it denied Horton's motion to quash his arrest and suppress the evidence.

¶ 5                                    BACKGROUND

¶ 6    The State charged Horton with seven gun-related counts, but elected to proceed only on the charge of armed habitual criminal (knowingly possessing a firearm after being convicted of two qualifying felonies), a Class X felony. 720 ILCS 5/24-1.7 (West 2010).

¶ 7                       Motion to Quash Arrest and Suppress Evidence

¶ 8    Before trial, Horton filed a motion to quash the arrest and suppress evidence. He argued that the police had no warrant and no probable cause to arrest him, and, therefore, the evidence connecting him with a crime came within the purview of the exclusionary rule and should have

been suppressed as the fruit of the illegal arrest. See *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wong Sun v. United States*, 371 U.S. 471 (1963).

¶ 9 The only witness at the hearing, Chicago police officer Roderick Hummons, testified that around 3 p.m. on August 11, 2011, while on patrol in an unmarked police car, he and his partner, Officer Nyls Meredith, drove past a house at 6901 East End Avenue, Chicago. Hummons saw two people on the porch, and Horton standing in front of them. At that point, Hummons thought Horton lived in the house. Hummons did not see Horton violate any law.

¶ 10 Horton looked in Hummons's direction. When he did, Hummons noticed a "metallic object in his waistband." According to Hummons, he told Meredith, who was driving, to stop. As the officers were getting out, Horton turned and rushed inside the house. Hummons claimed he found a set of keys on the ground, and about five minutes later, used the keys to unlock the door. Hummons and Meredith went inside.

¶ 11 Hummons went upstairs because he heard a noise there. He saw Horton in one of the bedrooms crouched next to a bed. Hummons thought Horton was "concealing an item." Hummons detained Horton. Meredith recovered a handgun from under the mattress. The handgun appeared to Hummons to be what he saw sticking out of Horton's waistband. Horton told Hummons that he did not live at the house, the bedroom was not his, and neither was the gun.

¶ 12 Defense counsel questioned Hummons about his preliminary hearing testimony, the transcript of which is not included in the record. At the preliminary hearing, Hummons said nothing about the object being or appearing to be a butt of a handgun, only a "chrome metal object." Defense counsel asked, "you could have said you saw a gun, but you didn't believe you saw a gun yet, isn't that true?" Hummons replied that was correct. Hummons then stated that what he saw in Horton's waistband when he was outside was shiny, a "very chrome weapon."

¶ 13 Defense counsel asked whether the weapon had a wooden handle. Hummons testified that it had wooden grips, but the grips covered only part of the handle and the remainder was metal. He said the handle had chrome around it and a chrome "slide."

¶ 14 The parties stipulated that a "firearms receipt" and "work sheet report" Hummons prepared described the gun as a Taurus with a black handle.

¶ 15 The State argued that Horton was not "seized at any point" until the handgun was recovered. Horton had no reasonable expectation of privacy in the bedroom; but even if he did, the officer was acting in "hot pursuit" and exigent circumstances justified taking Horton into custody and recovering the handgun without either an arrest or search warrant.

¶ 16 Horton argued that Hummons's testimony varied from that of his preliminary hearing testimony in which he said he saw a "metal object." Horton further argued that his entry into the house did not justify the officers' entry. Finally, Horton asserted that no evidence suggested the officers obtained any information from the people on the porch about who lived in the house, nor was Hummons aware that the house was not Horton's.

¶ 17 The trial court denied Horton's motion, finding Hummons's testimony to be credible. The trial court found that Hummons had reasonable grounds to believe that a crime may have been or was being committed. Hummons did not know whether it was Horton's house, but "the officer chase[d] him into the house. It took some time because the keys—the officer's in hot

pursuit. Legally he can pursue a person into that house."

¶ 18                    Motion *In Limine* Regarding Gun Ownership

¶ 19    After the suppression hearing, but before trial, the State orally moved to preclude Horton from introducing evidence regarding the gun's ownership and whether the gun was stolen. Horton sought to introduce a document from the United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives National Tracing Center naming the owner and showing that the weapon was not stolen.

¶ 20    The trial court granted the State's motion *in limine*, finding the document was not self-authenticating because it was not certified, and ruling the document was inadmissible as the defense did not present a foundation witness for the document's admission.

¶ 21                                 Trial Testimony

¶ 22    At trial, Hummons testified that he and Meredith were on patrol on the south side of Chicago in an unmarked police car. Meredith drove slowly while Hummons scanned the neighborhood. As they passed a row house at 6901 East End Avenue, Hummons noticed an unidentified woman and man standing on the porch. Horton was standing some two to three feet away from the porch, not quite at the sidewalk, with his back to the street. Hummons made eye contact with Horton and noticed a "bulge" on the right side of his waist that had the "characteristics of a weapon." Horton was wearing a T-shirt. Horton then turned toward the house, and "his shirt raised a little" giving Hummons "a glimpse of a chrome metallic object" that he thought was the butt of a handgun.

¶ 23    Hummons told Meredith to stop and back up. As the two officers got out of the car, Horton rushed into the house and locked the door. Hummons followed him and tried the door. He and Meredith then detained the two people on the porch. Hummons stated that when the woman stood up, he noticed a set of keys near where she had been sitting. Hummons and Meredith called for backup. After the backup arrived about five or six minutes later, Hummons used the keys to unlock the front door. Hummons believed Horton had a gun in public. He did not know whether the house belonged to Horton or someone else.

¶ 24    Hummons entered the house, then Meredith. No one was on the first floor. Hummons heard noise on the second floor and went upstairs. There were two bedrooms. Hummons went to the bedroom straight ahead; Meredith went to the other bedroom. Hummons saw Horton crouching by the side of the bed. Hummons could not see Horton's hands. Hummons entered the bedroom with his gun drawn and ordered Horton to raise his hands and come out. At the same time, Meredith detained someone in the other bedroom. After the two were sent downstairs to the backup officers, Hummons told Meredith to check the bed where Horton had been crouching. Meredith recovered a chrome, semiautomatic handgun from under the mattress. Meredith checked the magazine and unloaded it. Hummons testified that the gun was the same gun he had seen in Horton's waistband minutes earlier. When the State asked how much of the gun was showing when Hummons observed it in Horton's waistband, Hummons said he saw "[j]ust behind the handle portion and back." He did not see the trigger mechanism or the barrel, but the part he saw was silver-metallic as well as a darker grip color.

¶ 25    On cross-examination, defense counsel questioned Hummons about his testimony at the preliminary hearing. When Hummons testified that he saw a "chrome metal object" and "could

not tell what it was," defense counsel asked, "[b]ut today you told the ladies and gentlemen of the jury that you could tell what it was?" Hummons replied, "[y]es. It appeared to me to be a weapon, the butt of a handgun." Hummons testified at the preliminary hearing that he did not see Horton "make contact with" the gun found under the mattress. Hummons also stated the handgun was not examined or preserved for fingerprints or DNA.

¶ 26 Defense counsel questioned Hummons regarding parts of his testimony that were not included in either the original incident report or the arrest report. Among other things, Officer Hummons did not include in his report that he saw a bulge on Horton's hip, that he saw the butt of a weapon, or that he saw the handle of a weapon. Hummons did not include in his report that Horton went inside and locked the door, that Hummons heard noise upstairs, or that someone was in the other bedroom.

¶ 27 On recross, Hummons stated that he never saw a gun in Horton's hand. Hummons explained that as a police officer, he did not have the authority to submit evidence for fingerprints or DNA. Detectives submitted weapons recovered by the police for testing, and no detectives were assigned to the case. Hummons did not call for an evidence technician to recover the weapon, although he could have done so.

¶ 28 Meredith also testified. He was driving when Hummons told him to stop and back up. He reversed, and Hummons jumped out of the car and began to run. Meredith ordered the two individuals on the porch to his car, and they complied. He called for assistance, which arrived in about five to six minutes. Then he and Hummons entered the house using the keys. They went upstairs and saw two bedrooms. Meredith went into the bedroom to the left, where he found a man lying in the bed, while Hummons went into the other bedroom. Meredith brought the man out into the hallway where Hummons had Horton detained, and the two officers directed the men downstairs. Hummons then told Meredith to search the area of the bed where Horton was crouching. Meredith observed a "bulge" in the mattress and found a handgun underneath. The gun was a semiautomatic handgun with a chrome finish and a black plastic handle.

¶ 29 Meredith said that when he was driving, he had an unobstructed view of three people in front of the house, and first saw Horton from a block to a block and a half away. When Meredith pulled the car up, Horton stood about six feet away from the car. Horton ran into the house and Hummons ran after him. When Meredith and Hummons entered the house, they had their guns drawn and announced "Chicago police" several times. Meredith never saw a bulge in Horton's waistband, and Hummons never told him he had seen a weapon. Finally, he testified that he never saw Horton in the bedroom or Horton place the gun under the mattress.

¶ 30 On redirect, Meredith stated he saw Horton's back as he rushed inside, but could not see Horton's right side.

¶ 31 The State entered into evidence certified copies of Horton's convictions in 1998 and 2003 for possession of a controlled substance with intent to deliver. The parties stipulated that these convictions were qualifying felonies for the purpose of the armed habitual criminal charge.

¶ 32 After the State rested, Horton's motion for a directed verdict was denied.

¶ 33 Corey Beattie testified for the defense. Beattie had known Horton for about 10 years. Beattie lived in the two-bedroom townhome with his 32-year-old half-brother, Deondre Williams. Beattie stated he worked as an independent contractor for a home inspection

company, earning $70,000 annually, and would not jeopardize his job by coming to court and lying.

¶ 34    On the day of Horton's arrest, Beattie was upstairs in his bedroom watching SportsCenter on ESPN. Horton had been outside with Williams and Williams's girlfriend for about an hour. About 10 minutes before the police arrived, Horton came into Beattie's room and said the police were outside. Beattie looked out the window and saw police officers searching Williams and Williams's girlfriend. Horton sat in a chair in the bedroom and the two watched ESPN for about 5 to 10 minutes. Once Horton entered his room, Horton never left his presence and never went into Williams's room.

¶ 35    About 10 minutes after Horton entered his room, Beattie heard the police come in and announce "police." Beattie yelled to them that he and Horton were upstairs. Horton did not leave the bedroom when the police announced their presence. The officers detained Beattie and Horton and took them downstairs. The police officers then went back upstairs and returned with a handgun, which Beattie recognized as belonging to Williams.

¶ 36    The bedroom the officers searched belonged to Williams. Beattie had seen Williams holding the gun in his bedroom the day before and had seen Williams with the gun several times. Beattie did not know where Williams kept the gun.

¶ 37    Horton did not testify.

¶ 38    The jury convicted Horton of one count of armed habitual criminal. The trial court sentenced Horton to 12 years' imprisonment, with a 3-year period of mandatory supervised release.

¶ 39                                    ANALYSIS

¶ 40                               Supplemental Briefing

¶ 41    After completing briefing, this court *sua sponte* requested the parties brief "whether there was probable cause to pursue Horton initiated by the officer's observations of Horton in the wake of the rulings in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *People v. Aguilar*, 2013 IL 112116, and *People v. Burns*, 2015 IL 117387."

¶ 42                        Motion to Quash Arrest and Suppress Evidence

¶ 43    Horton contends that the officers, who were acting without a warrant, had no probable cause to arrest him or enter the house and search the bedroom. He argues that the trial court should have granted his motion to quash the arrest and suppress the evidence because the warrantless entry into the house violated his fourth amendment protection against unreasonable search and seizure. The State responds that the trial court properly denied the motion as (i) Horton had "no reasonable expectation of privacy in the house," and (ii) the police officers' "hot pursuit" of Horton constituted exigent circumstances.

¶ 44    On review, this court defers to the trial court's findings of fact in a motion to suppress and will reverse a trial court's findings and credibility assessments only where they are against the manifest weight of the evidence. *People v. Absher*, 242 Ill. 2d 77, 82 (2011). We then assess the established facts in relation to the issues presented and draw conclusions to decide what relief, if any, should be granted. *Id.* In reaching our determination, we may consider testimony presented at trial, in addition to that provided at the suppression hearing. *People v. Melock*, 149

Ill. 2d 423, 433 (1992). We review *de novo* the legal question of whether the facts warrant suppression. *Id.*

¶ 45    Probable cause exists where an arresting officer has knowledge of facts and circumstances that would have led a reasonable person to conclude the defendant has committed or is committing a crime. *People v. Jones*, 215 Ill. 2d 261, 273-74 (2005) (citing *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949)). Ultimately, the probability of criminal activity and common-sense considerations, not proof beyond a reasonable doubt, determines whether probable cause has been established. *People v. Montgomery*, 112 Ill. 2d 517, 525 (1986) (citing *People v. Tisler*, 103 Ill. 2d 226, 236 (1984)). At the same time, probable cause is "more than bare suspicion." *Jones*, 215 Ill. 2d at 273; see *People v. Bunch*, 327 Ill. App. 3d 979, 983-84 (2002) ("Suspicions, no matter how reasonable, do not add up to probable cause to arrest.").

¶ 46    In his supplemental brief, Horton argues that the officers' observations did not provide probable cause for the search and seizure. The State maintains that *Heller*, *McDonald*, *Aguilar*, and *Burns* do not invalidate probable cause determined by the totality of the circumstances facing the police officers.

¶ 47    The aggravated unlawful use of a weapon (AUUW) statute, in place in at the time of this offense on August 2011 (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2010)), was declared unconstitutional in *Aguilar*, 2013 IL 112116, ¶ 21 (statute categorically prohibiting possession and use of operable firearm for self-defense outside home declared facially unconstitutional). In *Burns*, 2015 IL 117387, our supreme court clarified its holding in *Aguilar*, declaring section 24-1.6(a)(1), (a)(3)(A) "facially unconstitutional, without limitation." *Id.* ¶ 25. Addressing the argument that the statute could be applied to felons without violating the second amendment, the *Burns* court declared "[a]n unconstitutional statute does not 'become constitutional' simply because it is applied to a particular category of persons who *could have been regulated*, had the legislature seen fit to do so." (Emphasis added.) *Id.* ¶ 29.

¶ 48    On August 11, 2011, Illinois law prohibited the possession of an operable, uncased, loaded, and immediately accessible handgun in public. 720 ILCS 5/24-1.6(a)(l), (a)(3)(A) (West 2010). Nevertheless, as already discussed, this statute has been invalidated, making it void *ab initio*. "The very nature of legislative actions makes retroactivity the proper course when a statute is declared unconstitutional." *People v. Gersch*, 135 Ill. 2d 384, 395 (1990). "An unconstitutional law 'confers no right, imposes no duty, and affords no protection. It is *** as though no such law had ever been passed.' " *Id.* at 399 (quoting *People v. Schraeberg*, 347 Ill. 392, 394, 179 (1932)). Recognizing the harshness of the *ab initio* doctrine, especially in situations involving law enforcement relying in good faith on the statute's validity, the *Gersch* opinion still concluded the *ab initio* doctrine should apply in the area of criminal prosecutions. *Id.* at 400-01.

¶ 49    The State asserts the "key question for any reviewing court examining the validity of a probable cause determination is whether probable cause existed for a defendant's arrest based on 'the totality of the circumstances at the time of the arrest' " (quoting *People v. Grant*, 2013 IL 112734, ¶ 11). But *Grant* is neither analogous nor relevant to our analysis. The question before the *Grant* court involved the issue of probable cause where an undercover officer arrested the defendant for violating a city ordinance, after witnessing the defendant yell a term for the sale of cannabis at passing cars in an area known for high drug activity. Here, a person standing in front of a house had what appeared to be a metallic object in his waistband. At the preliminary hearing, in response to defense counsel asking, "you could have said you saw a

gun, but you didn't believe you saw a gun yet, isn't that true?" the officer replied that was correct. Then, at the motion to suppress, the same officer said he thought it "may or may not" be a weapon.

¶ 50  Post-*Aguilar*, the possible observation of a handgun is not in itself, without any other evidence of a crime, sufficient to provide an officer with probable cause for arrest. We have reviewed the record and have found the evidence established no basis for probable cause other than a hunch that the metallic object might be a handgun, nor does the State provide a different basis for probable cause.

¶ 51  We now turn to whether evidence seized under this portion of the AUUW statute, at the time permissibly relied on by the officers, but later found to be facially unconstitutional, may be used against Horton. Under the exclusionary rule, where evidence has been obtained in violation of the fourth amendment, the evidence may not be used against the defendant in a criminal proceeding. *Davis v. United States*, 564 U.S. 229, 231-32 (2011). The purpose of the exclusionary rule, however, is not to provide a constitutional right to the aggrieved party, but to deter improper conduct by agents of the government. *United States v. Leon*, 468 U.S. 897, 906 (1984) (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Accordingly, there is a "good-faith exception" to the exclusionary rule, recognizing the use of evidence where the officer acted in "objectively reasonable reliance" on a subsequently invalidated search warrant (*id.* at 922) or a statute authorizing warrantless administrative searches ultimately found to violate the fourth amendment (*Illinois v. Krull*, 480 U.S. 340, 349-50 (1987)). Further, the exclusionary rule does not necessarily bar evidence obtained by police in a search based on a violation of a law later invalidated as unconstitutional. *Michigan v. DeFillippo*, 443 U.S. 31, 38-39 (1979). The State contends that the "good-faith exception" applies.

¶ 52  The State's argument fails. Our supreme court has held the "good-faith exception," recognized by United States Supreme Court in *Krull*, violates the Illinois constitutional provision prohibiting unreasonable searches and seizures. *People v. Krueger*, 175 Ill. 2d 60, 74 (1996). Before *Krueger*, the Illinois Supreme Court applied the "lockstep doctrine," following United States Supreme Court rulings in fourth amendment cases. But in *Krueger*, our supreme court declined to adapt the *Krull* decision by applying the good-faith exception to allow otherwise inadmissible evidence. In *Krueger*, the Illinois Supreme Court stated: " 'Decisions involving the exclusionary rule and the Illinois Constitution's article I, section 6, require that we carefully balance the legitimate aims of law enforcement against the right of our citizens to be free from unreasonable governmental intrusion.' " *Id.* at 75 (quoting *Tisler*, 103 Ill. 2d at 245). *Krueger* then decided that citizens' rights prevail because an exception to the Illinois exclusionary rule would provide a "grace period" for unconstitutional search and seizure legislation, "during which time our citizens' prized constitutional rights can be violated with impunity." *Id.* Further, "We are particularly disturbed by the fact that such a grace period could last for several years and affect large numbers of people. This is simply too high a price for our citizens to pay." *Id. Krueger* concluded that article I, section 6, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 6) prohibits applying *Krull*'s extended good-faith exception to our state exclusionary rule. *Krueger*, 175 Ill. 2d at 75-76.

¶ 53  In 2002, our supreme court refused to apply the good-faith exception based on the void *ab initio* doctrine in *People v. Carrera*, 203 Ill. 2d 1, 16-17 (2002). The court's ruling in *Carrera* applied a similar rationale to that in *Krueger*, holding unlawful an arrest made under a statute later found to be unconstitutional and subjecting the evidence seized in conjunction

with the arrest to the exclusionary rule. *Id.* A facially invalid statute, hence void *ab initio*, is treated "as though no such law had ever been passed," and to find otherwise would be to "provide a grace period *** during which our citizens would have been subject to *** arrests without proper authorization." *Id.* at 14, 16. This court has applied *Carrera* with equal force to "legislative acts that were found unconstitutional for violating substantive constitutional guarantees." *People v. Holmes*, 2015 IL App (1st) 141256, ¶ 31.

¶ 54　　The Illinois Supreme Court recently reaffirmed the principle that the void *ab initio* doctrine renders a facially unconstitutional statute unenforceable and a conviction under the statute subject to vacatur. *People v. McFadden*, 2016 IL 117424, ¶¶ 20, 22 (conviction of AUUW, after stipulation to earlier conviction under statute later declared unconstitutional in *Aguilar*, subject to nullification on collateral attack).

¶ 55　　Accordingly, we find the void *ab initio* doctrine precludes applying the good-faith doctrine.

¶ 56　　　　　　　　　　　　　　　　　　　*Terry* Stop

¶ 57　　In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court held that a police officer does not violate the fourth amendment when he or she conducts a brief, investigatory stop of a person based on a reasonable, articulable suspicion of criminal activity. *Id.* at 30. The question becomes whether a reasonable person in the officer's position would have been justified by objective evidence in stopping the defendant. *Id.* The State's attempt to transform this search and seizure into a *Terry* stop has no merit.

¶ 58　　The dissent argues the officer did have reasonable suspicion for an investigatory *Terry* stop, because, although possessing a handgun could be a legal concealed carry, it could be illegal if Horton did not possess a firearm owners identification (FOID) card (as required by 430 ILCS 65/0.01 *et seq.* (West 2010)), and the officer could have stopped Horton to investigate whether Horton was carrying the gun legally. This rationale leads down a dangerous path. By way of analogy, it is also illegal to drive a car without a valid license. If an officer makes eye contact with another motorist, and that motorist then turns onto another street, can the officer execute a traffic stop to verify that the motorist has a valid driver's license? In that situation, we would say the police officer needed to have reasonable suspicion, based on articulable facts, that this particular motorist did not have a valid license. Officer Hummons had no articulable facts to believe that Horton was carrying a firearm without a valid FOID card. For that matter, in our hypothetical, the officer stopping the motorist had more reasonable suspicion than Hummons, because the officer saw the motorist driving while Officer Hummons had a hunch that Horton was carrying a handgun based on his momentary view of an object in Horton's waistband. Hummons testified at the preliminary hearing that he saw a chrome metal object but could not tell what it was. Yet, later, at trial, he stated that he thought the object was the butt of a handgun. The original, closer-in-time testimony cannot be ignored—as Hummons also testified that he "could not tell what [the chrome metal object] was," his suspicions about a "chrome metal object" do not constitute specific and articulable facts that justify a *Terry* stop.

¶ 59　　The State theorizes that the officers' approach and subsequent pursuit of Horton was justified based on reasonable articulable suspicion under *Terry*, 392 U.S. 1. But probable cause for a *Terry* stop does not morph into probable cause to enter a citizen's house protected by the fourth amendment. See *People v. Wear*, 229 Ill. 2d 545, 566-67 (2008) (entering residence "to

merely conduct an investigatory *Terry* stop" violates fourth amendment). "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *Id.* at 563.

¶ 60 The dissent would hold the totality of the circumstances supports a finding of reasonable suspicion and the officer's pursuit of Horton was reasonable. *Infra* ¶ 90. But the totality of the circumstances is no substitute for the reasonable suspicion of criminal wrongdoing, based on "specific and articulable facts" from which a determination can be made that the police officer's action was not arbitrary or harassing. *Terry*, 392 U.S. at 21. In *Terry*, the police officers watched the defendant and another man for 10 to 12 minutes on a street corner. Something about the two men did not "look right" and aroused suspicion. The officer followed them and when they stopped to talk to a third man, the officer approached and identified himself. These facts sharply contrast with this case. The officers in *Terry* had ample time to observe the suspects, while the police officer here was riding in a moving car, saw Horton for a moment, and immediately decided to stop him. The defendants in *Terry* were "pacing, peering, and conferring" in front of some stores (*id.* at 6); Horton stood in a front yard of a house that Hummons thought was Horton's home.

¶ 61 The dissent attempts to justify the entry into the residence with a factually unrelated scenario, asking, "Should [a police officer] allow a person with a firearm to run into a building and possibly inflict mayhem on its occupants or warn his confederates, who may be engaged in criminal activity, that the police are outside?" *Infra* ¶ 90. Again, the testimony established the officers were driving on patrol past a house on a summer afternoon and saw two men and a woman talking outside. One of the men ran in the house when he saw a police officer look directly at him, and the man *may or may not h*ave had a gun in his waistband. Hummons testified at the hearing on the motion to quash the arrest and suppress the evidence that he did not see Horton break any law. Hummons only described what he saw as a "metallic object," but agreed in response to the prosecutor's question that he "recognized" the object as the butt of a handgun. Tellingly, Hummons agreed as well with the defense attorney—that at the preliminary hearing Hummons described the object as a "chrome metal object" and did not "believe he saw a gun yet."

¶ 62 Hummons's testimony at the preliminary hearing, as closer in time to the actual event, cannot be minimized or dismissed. Glaringly, Hummons's testimony evolved ever more definitively and conclusively from that of the preliminary hearing to trial. Hummons's testimony at trial—that he saw a bulge under Horton's shirt that "had the characteristics of a weapon" and "appeared" to be a weapon—was absent from his preliminary hearing testimony. A warrantless entry into the house based on a generalized suspicion or hunch that Horton may or may not have been in possession of a gun is unjustified under *Terry*. See *People v. Lampitok*, 207 Ill. 2d 231, 255 (2003) ("[r]easonable suspicion" requires more than "mere 'hunch' " on officer's part (quoting *People v. Scott*, 148 Ill. 2d 479, 503 (1992))); *People v. Ray*, 327 Ill. App. 3d 904, 909-10 (2002) (officer's basis for stop must be "objectively reasonable" and not based on "inarticulate hunches or unparticularized suspicions").

¶ 63 Regarding the motion to suppress, the dissent states "the trial court found that 'certainly based upon the totality of the circumstances, the fact that the officer believed *he may have had a gun* in his waistband.' " (Emphasis added.) *Infra* ¶ 85. Similarly, regarding an articulable suspicion of criminal activity, the dissent characterizes the evidence as "a reasonable police officer seeing a person in possession of *what appears to be* a gun." (Emphasis added.) *Infra*

¶ 86. Yet the dissent also states the evidence at the hearing on the motion to suppress *established* "that the defendant was seen standing near the sidewalk with a gun in his waistband." *Infra* ¶ 90. Believing something "may" have been true is different from the evidence established the fact. An inference could be drawn, but even considering the statement in terms of what the police officer believed, the officer's seismic shift in the testimony cannot meet the manifest weight of the evidence standard.

¶ 64 In addition, the dissent states, "[t]he officers' pursuit of defendant under these circumstances was reasonable." *Infra* ¶ 87 (citing *United States v. Santana*, 427 U.S. 38, 43 (1976)). But in *Santana*, an undercover narcotics officer used marked bills to pay for a heroin "buy" from the defendant's accomplice. The officer and the accomplice then drove to the defendant's residence to pick up the heroin. The officer and the accomplice drove away, and when she handed the officer the heroin, he arrested her and asked where the money was. She told him the defendant had it. The officer and backup police returned to the defendant's home where they saw the defendant standing in the doorway holding a brown paper bag. *Santana*, 427 U.S. at 39-40. The officers approached and identified themselves as police, at which point the defendant "retreated into the vestibule of her house." *Id.* at 40. The police followed her and when she dropped a brown paper bag (later found to contain heroin packets), she was arrested. The marked bills used in the buy were in her pocket. *Id.* at 40-41.

¶ 65 The United States Supreme Court determined the defendant was in a public place outside her house, the police had probable cause to arrest her, and the police were in "hot pursuit" when they followed her into the vestibule. Further, "[o]nce Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence." *Id.* at 43.

¶ 66 Assuming Horton had no expectation of privacy inside the house, the State would not have met its burden of demonstrating exigent circumstances when we begin with the fact that the officer had no basis for a *Terry* stop because his differing stories about what he saw did not constitute specific and articulable facts. A gun is not as disposable as either money or drugs. The "exigent circumstances" of suspects with narcotics or other easily destroyed evidence does not apply. Even potential destruction of drugs does not constitute exigent circumstances sufficient to justify a warrantless entry unless the police officers have particular reasons to believe that the evidence will be destroyed. *People v. Urbina*, 393 Ill. App. 3d 1074, 1082 (2009) (citing *People v. Wimbley*, 314 Ill. App. 3d 18, 28 (2000)).

¶ 67 Finally, even if an investigatory *Terry* stop was justified (which it was not), the dissent's position ignores the fact that the officers lacked probable cause for the *Terry* stop and for the entry into the house. See *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (limited investigatory stops must be founded on reasonable suspicion of criminal activity). Fortuitously picking up the keys to a citizen's locked house, unlocking the door, and going inside the house without a warrant over five or six minutes after Horton does not amount to "hot pursuit" when the officer had a suspicion but did not see Horton commit a crime. See *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) ("hot pursuit" involves immediate or continuous pursuit of suspect from scene of crime).

¶ 68 At the hearing on the motion to quash the arrest, Hummons testified that when he first saw three people outside the house, he thought Horton lived there, while at trial he testified he did not know whether the house belonged to Horton or to someone else. In fact, Horton did not live there, but the police acted before they learned this. Entering a locked private home in pursuit of

a citizen without a warrant or probable cause violates the fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution. See *People v. Foskey*, 136 Ill. 2d 66, 74 (1990) (citing *Payton v. New York*, 445 U.S. 573 (1980) (absent exigent or compelling circumstances justifying the entry, police officers are prohibited from entering a home without warrant).

¶ 69                                    The Issue of Horton's Flight

¶ 70     The State asserts a second factor justified the officers' actions: Horton's quick steps from the porch and into the house. In Illinois, a defendant's flight from police can be considered as an additional factor in determining probable cause. *People v. Jones*, 196 Ill. App. 3d 937, 956 (1990). Yet, a person's motive is not determinative by any means. See *People v. Peete*, 318 Ill. App. 3d 961, 966 (2001) (flight alone not necessarily indicative of criminal activity).

¶ 71     The reality of law enforcement in today's racially charged environment has caused the disproportionate targeting of young black males for stopping and questioning. Unfortunately, the same activity in different urban neighborhoods with different actors may be viewed differently. We take judicial notice of the recent United States Department of Justice report finding that the Chicago police department had engaged in a "pattern or practice" of unreasonable force, and that this practice, even when citizens are physically unharmed, leads to "fear and distrust" from citizens. See United States Department of Justice, Civil Rights Division, and United States Attorney's Office, Northern District of Illinois, *Investigation of the Chicago Police Department* 23 (Jan. 13, 2017), https://www.justice.gov/usao-ndil/press-release/file/925976/download. This excessive-force problem occurs most often in black and Latino neighborhoods—in fact, CPD officers use force almost 10 times more often against blacks than against whites. *Id.* at 144-45. Excessive-force complaints aside, the DOJ report noted that many Chicago residents, particularly black and Latino residents, feel that CPD officers "assume that they are perpetrators of crime" and unfairly target them. *Id.* at 142-43.

¶ 72     The negative interactions between the police and members of the community form the basis of minority communities' fear and distrust of police. And thus, it is not difficult to imagine why a young black man having a conversation with friends in a front yard would quickly move inside when seeing a police car back up.

¶ 73     In 2015, the American Civil Liberties Union identified a historical pattern of disproportionate stops from May through August 2014 in Chicago. Black Chicagoans were subjected to 72% of all stops even though this demographic constitutes just 32% of the city's population. During the same time, more than 250,000 stops—primarily of blacks—did not lead to an arrest. See ACLU of Illinois, *Stop and Frisk in Chicago* 9, 11 (Mar. 2015), http://www.aclu-il.org/wp-content/uploads/2015/03/ACLU_StopandFrisk_6.pdf. Not only law enforcement, but also a significant proportion of the public, implicitly perceive young black men as a threat and more likely to be involved in criminal activity. Justin D. Levinson, *Forgotten Racial Equality: Implicit Bias, Decisionmaking, and Misremembering*, 57 Duke L.J. 345, 354 (2007) ("people possess attitudes and stereotypes over which they have little or no 'conscious, intentional control' ").

¶ 74     A recent decision from the Massachusetts Supreme Judicial Court, *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016), illustrates problems inherent in criminal jurisprudence regarding investigatory stops by police. The *Warren* court stated flight is relevant to the reasonable suspicion analysis "in appropriate circumstances" but added two cautionary notes

regarding the weight to be given this factor. *Id.* at 341. First, the *Warren* court perceived "a factual irony in the consideration of flight as a factor in the reasonable suspicion calculus. Unless reasonable suspicion for a threshold inquiry already exists, our law guards a person's freedom to speak or not to speak to a police officer. A person also may choose to walk away, avoiding altogether any contact with police." *Id.* The *Warren* court continued, "Second, *** where the suspect is a black male stopped by the police on the streets of Boston, the analysis of flight as a factor in the reasonable suspicion calculus cannot be divorced from the findings in a recent Boston Police Department *** report documenting a pattern of racial profiling of black males in the city of Boston." *Id.* at 342.

¶ 75    Recognizing a defendant's evasive conduct during an encounter with police to be one factor to consider in the reasonable suspicion analysis, the *Warren* court cautioned against deeming this fact alone sufficient to establish probable cause to stop. See *Commonwealth v. Mercado*, 663 N.E.2d 243, 246 (Mass. 1996) ("Neither evasive behavior, proximity to a crime scene, nor matching a general description is alone sufficient to support *** reasonable suspicion."); *Commonwealth v. Thibeau*, 429 N.E.2d 1009, 1010 (Mass. 1981) (quick maneuver to avoid contact with police insufficient to establish reasonable suspicion). The *Warren* court goes further: " 'Were the rule otherwise, the police could turn a hunch into a reasonable suspicion by inducing the [flight] justifying the suspicion.' " *Warren*, 58 N.E.2d at 341 (quoting *Commonwealth v. Stoute*, 665 N.E.2d 93, 97-98 (Mass. 1996), quoting *Thibeau*, 429 N.E.2d at 1010).

¶ 76    The *Warren* court speaks to a troubling reality that occurs in certain areas of the City of Chicago, a reality that cannot be ignored. Chicago is not Boston, but there are definite similarities regarding police interaction with blacks. We echo the Massachusetts Supreme Judicial Court's concern that, in an environment where minorities have legitimate suspicion of how they might be treated by police, they will be more likely to try to avoid police contact—even though doing so makes them appear culpable of something. We agree with the *Warren* court's analysis; absent any other information tending toward an individualized suspicion that the defendant was involved in the crime, deliberate evasive conduct alone does not support a reasonable suspicion.

¶ 77    A footnote in *Terry* quotes the 1967 President's Commission on Law Enforcement and Administration of Justice, which referred to field interrogations as a "source of friction between the police and minority groups." *Terry*, 392 U.S. at 14 n.11. Also, the exclusionary rule would not stop "the wholesale harassment" by some police officers of minority groups, "particularly [blacks]." *Id.* at 14. Despite the passage of 50 years, these statements remain true today. Then, as now, "when such conduct is identified, it must be condemned by the judiciary and its fruits must be excluded from evidence in criminal trials." *Id.* at 15.

¶ 78    Our resolution of the lawfulness of the seizure of the handgun disposes of Horton's other arguments, *i.e.*, that the trial court improperly barred him from introducing registration and ownership evidence of the gun; the State failed to prove him guilty beyond a reasonable doubt; and trial counsel was ineffective for failing to present evidence that the weapon in question was owned by another person. Therefore, we do not address them.

¶ 79    Reversed.

¶ 80        JUSTICE PIERCE, dissenting.

¶ 81        The majority has taken the position that, "[p]ost-*Aguilar*, the possible observation of a handgun is not in itself, without any other evidence of a crime, sufficient to provide an officer with probable cause for arrest." *Supra* ¶ 50. This sweeping conclusion, in my judgment, is contrary to existing law and is not warranted under *Aguilar*; it will do nothing to assist in reducing illegal gun possession, the number one contributor to the raging gun violence which is plaguing our community, and it will do nothing to address the near universal demand for effective, constitutional enforcement of existing gun laws that remain post-*Aguilar*. For the reasons that follow, I respectfully dissent.

¶ 82        *Aguilar* invalidated certain sections of the aggravated unlawful use of a weapon statute which "categorically prohibit[ed] the possession and use of an operable firearm for self-defense outside the home." *People v. Aguilar*, 2013 IL 112116, ¶¶ 21-22. While it is clear that after *Aguilar* the mere possession of a gun in public is no longer a criminal offense, it is also clear that the *Aguilar* court only addressed the constitutionality of gun possession in a limited context. In *Aguilar*, our supreme court did not consider any aspect of other important areas of criminal law jurisprudence that interact with and relate to the actions of police officers charged with enforcement of valid gun laws and whether police officers have acted with "reasonable articulable suspicion" under *Terry v. Ohio*, 392 U.S. 1, 21 (1968), section 107-14 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/107-14 (West 2010)), or whether probable cause to arrest exists or whether the exclusionary rule bars introduction of a seized weapon at trial. *Aguilar* left in place other statutory offenses that flow from possessing a firearm. *Aguilar* does not prevent police officers from effectuating a stop, pursuant to *Terry* or pursuant to section 107-14 of the Code, of an individual in possession of a gun in public for the purpose of determining, for example, whether that person has a FOID card, is a felon, is a minor, or is in possession of weapon with a defaced serial number. Possession of a firearm without a valid FOID card is a criminal offense, as is possession of firearm by a felon or a minor, and possession of firearm with a defaced serial number (720 ILCS 5/24-1.6(a)(1), (a)(3)(I); (a)(2), (a)(3)(I); (a)(1), (a)(3)(C); (a)(2), (a)(3)(C) (West 2014); 720 ILCS 5/24-1.1, 24-5(b) (West 2014); *People v. Holmes*, 2015 IL App (1st) 141256). And *Aguilar* did not create the requirement that a police officer articulate which specific criminal statute prompted his interaction with the defendant to justify an arrest and seizure.

¶ 83        Here, the majority concludes, without convincing explanation and contrary to established precedent, that *Terry* does not apply under these circumstances. A *Terry* stop is a type of police-citizen encounter, which allows for a brief investigative detention, when supported by a reasonable, articulable suspicion of criminal activity. *Terry*, 392 U.S. at 21; 725 ILCS 5/107-14 (West 2010). "An officer may make an investigatory stop *** if he or she reasonably infers from the circumstances that an offense has been committed or is about to be committed." *People v. Henderson*, 266 Ill. App. 3d 882, 885 (1994). The question is whether the facts available to the officer warrant a person of reasonable caution to believe that the action, which the officer took, was appropriate. *People v. Houlihan*, 167 Ill. App. 3d 638, 642 (1988). An evaluation of a *Terry* stop necessarily entails balancing the need for the seizure against the invasion that the seizure entails. *Terry*, 392 U.S. at 21.

¶ 84        The underlying principles of *Terry* and its progeny have evolved over 50 years resulting in an established body of law, and nothing in *Aguilar* leads to the conclusion that the underlying principles of *Terry* have been modified, altered, or replaced as a consequence of *Aguilar*. I rely

- 14 -

on the precedent established under *Terry*, not the underlying facts in *Terry*. Consequently, I must respectfully disagree with the analysis and conclusion reached by the majority.

¶ 85       The facts, found by the trial court to be credible, showed that Officers Hummons and Meredith were on patrol traveling eastbound on 69th Street, when they saw defendant standing near the sidewalk in front of a row house. Officer Hummons saw a bulge at the right side of defendant's waist and when defendant turned, his shirt lifted up and Officer Hummons could see a chrome metallic object. Officer Hummons told Officer Meredith to stop the car and back up. As Officer Hummons exited the vehicle, defendant ran into the row house. Officer Hummons chased him and entered the house. In the house, the officers found defendant hiding in a room and in constructive possession of a gun. In denying the motion to suppress, the trial court found that "certainly based upon the totality of the circumstances, the fact that the officer believed he may have had a gun in his waistband and secondly, looking at the officer turning and running into the house, the officer certainly had reasonable grounds to believe that a crime may have been committed or is being committed at the time he made these observations and based upon the actions of the defendant," "he's got a right to investigate," "the defendant fled," and "the officers' actions were reasonable." Further, the court found the officer was justified in entering the building because he was "in hot pursuit." We are obliged to accept these factual findings because they are not against the manifest weight of the evidence (*People v. Absher*, 242 Ill. 2d 77 (2011)), and the decision of the trial court is not clearly erroneous and should be affirmed. *People v. Williams*, 161 Ill. 2d 1 (1994). The surgical dissection of the arresting officers' testimony by the majority does nothing to alter the correct ruling on the motion to suppress evidence.

¶ 86       Even post-*Aguilar*, it cannot reasonably be argued that the circuit court was in error or that a reasonable police officer seeing a person in possession of what appears to be a gun did not have an articulable suspicion of criminal activity entitling him to make some sort of inquiry. Under the facts of this case, at the very least, Officer Hummons could have effectuated a valid *Terry* stop of defendant to inquire whether he possessed a FOID card. *Holmes*, 2015 IL App (1st) 141256; *People v. Thomas*, 2016 IL App (1st) 141040, ¶ 41. It would not be unreasonable for the officer to inquire if Horton was a felon, *which he was*. It would not be unreasonable for the officer to investigate, for example, whether criminal activity was in progress inside the row house and determine whether Horton was acting as a lookout. However, Officer Hummons did not get the chance to make a reasonable inquiry because defendant, after making eye contact with the officer, ran into the row house as Officer Hummons exited his vehicle.

¶ 87       The officers' pursuit of defendant under these circumstances was reasonable based on the principles established in *United States v. Santana*, 427 U.S. 38, 43 (1976) (defendant possessing contraband visible to public view that set in motion police pursuit cannot defeat arrest by escaping into vestibule of home). Rather than confronting and deciding the issue of whether defendant's flight justified the officers' actions in pursuing the gun possessing defendant, the majority essentially concludes that the only reason the officers chose to pursue Horton was because he was a young black male, ignoring the fact that defendant had a gun in his waistband and that he decided to run from the police as soon as he made eye contact with them. The majority offers their theory that the Chicago police department engages in the practice of targeting young black men and, therefore, Horton's flight is of no import and has no bearing or relevance to whether there was legal justification for his ultimate seizure, arrest, prosecution, and conviction.

¶ 88    The majority's reliance on, and discussion of, *Commonwealth v. Warren*, 58 N.E.3d 333 (Mass. 2016), which is not binding on Illinois courts, serves no purpose other than to inject the majority's perception of social injustice into this case to provide justification for its result, where no such argument was raised, much less intimated, by the defendant in the circuit court or on appeal. In point of fact, a complete, unbiased reading of *Warren* reveals that *Warren* did not prohibit flight as a consideration of the reasonable suspicion component of a valid *Terry* stop, rather it reaffirmed that flight is a relevant factor to consider but it instructed Massachusetts courts that flight should be considered with caution in the context of a probable cause analysis. *Id.* at 341-43.

¶ 89    Had the majority confined its discussion to the issues presented by the defendant in his appeal and adhered to established Illinois precedent, it would be compelled to find that the officers had a reasonable articulable suspicion to stop Horton and his immediate flight was an important consideration in deciding the ultimate issues presented in his motion to suppress evidence. "[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). An individual's refusal to cooperate with police, without more, does not amount to reasonable suspicion. *Id.* However, "[f]light, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id.* Reasonable suspicion determinations must be made on commonsense judgments and inferences about human behavior. *Id.*

¶ 90    I agree with the circuit court and the State that the totality of the circumstances supports a finding of reasonable suspicion. The trial court's conclusion, which is not against the manifest weight of the evidence and must be accepted, was that the defendant was seen standing near the sidewalk with a gun in his waistband. Defendant made eye contact with Officer Hummons. As Officer Hummons started exiting his vehicle, and before uttering a word, Horton ran from where he was standing into the row house. Undoubtedly, defendant had a right to go about his business. However, by running into a building, defendant's evasive behavior was not simply a refusal to cooperate with the officers, it was "the consummate act of evasion" and was "not going about one's business; in fact, it [was] just the opposite." (Internal quotation marks omitted.) *Id.* at 124-25. Should a reasonable officer have ignored what he just saw? Should he allow a person with a firearm to run into a building and possibly inflict mayhem on its occupants or warn his confederates, who may be engaged in criminal activity, that the police are outside? Common sense and human experience compels the conclusion that the last thing our citizens want is for police officers to shrug their shoulders and continue down the street when they see someone with a gun run away at the mere glance at a police officer. There is nothing illegal or unreasonable about the police conduct in this case. Defendant's conduct supports a finding of reasonable suspicion.

¶ 91    The majority also completely ignores the State's argument that the trial court correctly denied defendant's motion to quash arrest and suppress evidence because defendant did not have a reasonable expectation of privacy in the house where he was found to be in constructive possession of the gun. Defendant argues that the officers had "no grounds to detain anyone at 6901 East End Avenue, to search under the mattress in bedroom of that residence, or to arrest Defendant."

¶ 92    "Generally, a warrantless and nonconsensual entry into a suspect's home to make an arrest is prohibited by the fourth amendment, even with probable cause." *People v. Wear*, 229 Ill. 2d

545, 567 (2008) (citing *Payton v. New York*, 445 U.S. 573, 586-87 (1980)). However, the person claiming the protections of the fourth amendment must establish that he or she had a legitimate expectation of privacy in the place searched. *People v. Sutherland*, 223 Ill. 2d 187, 230 (2006). Factors relevant in determining whether a legitimate expectation of privacy exists include the individual's ownership or possessory interest in the property, prior use of the property, ability to control or exclude others' use of the property, and subjective expectation of privacy. *Id.* The defendant challenging a search has the burden of establishing that he had a legitimate expectation of privacy in the searched property. *People v. Johnson*, 114 Ill. 2d 170, 191-92 (1986).

¶ 93    Defendant does not argue that he had a legitimate expectation of privacy in the building where he was found hiding beside a bed. There is nothing in the record to establish that he had any ownership or possessory interest in the residence. In fact, defendant admits that he "had no relation to the residence besides that he was there on the day he was arrested." Based on the record before us, we should affirm the ruling of the trial court and find that defendant had no legitimate expectation of privacy in 6901 East End Avenue, the place where he was arrested, and therefore, defendant has no legal basis to challenge the search. The ruling of the circuit court in this respect should be affirmed.

¶ 94    I would find that the officers were properly in the house and that the recovery of the handgun from underneath the mattress was also proper. As stated above, the officers had probable cause to arrest defendant. "A search incident to a valid arrest is proper if the search is conducted either contemporaneously or immediately prior to the arrest." *People v. Tillman*, 355 Ill. App. 3d 194, 200 (2005). And, "[s]earching a person or a place under a suspect's control, without a warrant, is lawful when the search is made subsequent to a lawful arrest and is conducted with the goal of locating other items connected to the crime." *Id.* For the reasons above, I would affirm the trial court's denial of defendant's motion to quash arrest and suppress evidence.

¶ 95    Finally, I would find the remaining issues raised by defendant are without merit and I would affirm the defendant's conviction. The standard of review on a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). Discrepancies between the testimony of the two police officers and the defense witnesses were for the jury to resolve. We may not substitute our judgment for that of the jury on questions involving the weight of the evidence, the credibility of the witnesses, or the resolution of conflicting testimony. *People v. Campbell*, 146 Ill. 2d 363, 375 (1992). The trier of fact is not required to disregard inferences that flow from the evidence or search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 332 (2000). A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009). The State presented both theories of possession to the jury, and the trial court, over defendant's objection, instructed the jury as to both.

¶ 96    The evidence was sufficient to prove actual possession of a weapon based upon the testimony of Officer Hummons. Actual possession can be established based on direct evidence such as eyewitness testimony that defendant actually possessed the gun. See, *e.g.*, *People v. Bond*, 178 Ill. App. 3d 959, 966 (1989). There was also sufficient evidence of defendant's

constructive possession of the weapon found under the mattress in the room where he was arrested. *People v. Hannah*, 2013 IL App (1st) 111660, ¶ 28. The State can establish constructive possession by proving that defendant had knowledge of the firearm, and he exercised "immediate and exclusive control over the area where the weapon was found." *Id.* Constructive possession is often proven entirely by circumstantial evidence. *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003). Here, a reasonable trier of fact could have drawn the inference that defendant's flight from the police to the exact location where the handgun was ultimately found established that it was in fact defendant who placed the contraband in that location. *People v. Minniweather*, 301 Ill. App. 3d 574, 578 (1998); *People v. Peete*, 318 Ill. App. 3d 961, 966 (2001) (stating that the trier of fact may consider flight as circumstantial evidence).

¶ 97    I would also reject defendant's argument on appeal that the trial court erred when it barred him from introducing registration and ownership evidence of the gun in question, both before and during trial. Prior to trial, defendant sought to introduce a document which purported to show that the weapon in question was not stolen and was registered to Mr. Williams (whose bedroom the gun and defendant were both found in). Defendant also sought to elicit testimony regarding a conversation he had regarding the gun. The trial court granted both of the State's motions *in limine* to preclude this evidence on the basis that the document was both irrelevant to the charge and it lacked foundation.

¶ 98    "Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). A trial court abuses its discretion when its ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.* I would find that the trial court properly granted the State's motion *in limine* to exclude conversations between defendant and the officer about the handgun. Defendant did not testify at trial. Any out of court statement that he made to the officer regarding the gun is hearsay. See *People v. Kosearas*, 410 Ill. 456, 459 (1951) ("Self-serving conversations between the defendant and third parties subsequent to the commission of the crime are not competent evidence.").

¶ 99    As to the alleged trial court error in not allowing the admission of a document that purportedly showed that the gun in question was not stolen and was owned by Mr. Williams (whose bedroom the gun was ultimately recovered from), I would find no error. Whether the gun was stolen or whether the defendant owned the gun here is irrelevant. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Ill. R. Evid. 401 (eff. Jan. 1, 2011). Clearly one can possess a gun that has not been stolen. One can possess a gun and not own it. Actual possession was established where Officer Hummons observed defendant with a chrome metal object in his waistband that appeared to be a gun. The evidence of constructive possession was established by the evidence that, after pursuing defendant inside the house, Hummons saw defendant crouched down by a bed but could not see his hands, defendant was handcuffed, and the gun was recovered from under the mattress where defendant was crouching. Here, ownership of the weapon was not relevant where defendant both actually and constructively possessed the weapon. Further, the trial court granted the State's motion to bar admission of the document due to a lack of foundation. At the motion hearing, defense counsel argued that the document was a business record; however, defense counsel admitted that the document was not certified and that he did not have a witness

to establish a foundation for admittance of the document. Accordingly, the trial court did not abuse its discretion where it precluded defendant from presenting a document for which he could not lay a proper foundation.

¶ 100 Last, the claim of ineffective assistance of counsel must also be rejected because the claim is based on the failure of counsel to present the testimony of a "record keeper" to provide the foundation necessary to admit into evidence a document from the United States Department of Justice Bureau of Alcohol, Tobacco, Firearms and Explosives National Tracing Center to establish that the gun was not stolen and was properly registered to Mr. Williams. Defendant cannot meet the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), because, as previously discussed, the underlying claim has no merit, no prejudice resulted, and therefore, defendant's claims of ineffective assistance of counsel at trial must fail. See *People v. Coleman*, 168 Ill. 2d 509, 523 (1995); *People v. Pitsonbarger*, 205 Ill. 2d 444, 465 (2002).

¶ 101 For the foregoing reasons, I would affirm defendant's conviction.